```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                     CASE NO.  20-cv-25144-DPG
3


4

      JETAIRE AEROSPACE, LLC,
5
              Plaintiff/Counter-Defendant,
6
          vs.
7
                                              Miami, Florida
8                                             February 9, 2023
      AERSALE, INC.,                          Pages 1-62
9
              Defendant/Counter-Plaintiff.
10    _____

11                   TRANSCRIPT OF DISCOVERY HEARING
                  BEFORE THE HONORABLE EDWIN G. TORRES
12                CHIEF UNITED STATES MAGISTRATE JUDGE

13

14    APPEARANCES:

      FOR THE PLAINTIFF:     James F. McDonough, III, Esq.
15                           Heninger Garrison Davis, LLC
                             3621 Vinings Slope, Suite 4320
16                           Atlanta, GA 30339

17


18    FOR THE DEFENDANT:     Regis C. Worley, Jr., Esq.
                             Eversheds Sutherland (US) LLP
19                           12255 El Camino Real, Suite 100
                             San Diego, CA 92130-2071
20


21


22    TRANSCRIBED BY:        DAWN M. SAVINO, R.P.R., C.R.R.
                             Official Federal Court Stenographer
23                           400 N. Miami Avenue, 10S03
                             Miami, Florida  33128
24                           Telephone:  305-523-5598
                             Dawn_Savino@flsd.uscourts.gov
25
```

2

```
 1                      P-R-O-C-E-E-D-I-N-G-S
 2              THE COURT:  Good afternoon.  Have a seat.
 3              COURTROOM DEPUTY:  Calling case JetAire Aerospace, LLC
 4    versus AerSale, Incorporated, case number 20-25144-civil-Judge
 5    Gayles.
 6              Counsel, please state your appearances for the record,
 7    starting with the Plaintiff.
 8              MR. McDONOUGH:  Name's James McDonough on behalf of the
 9    Plaintiff.
10              MR. WORLEY:  Regis Worley on behalf of Defendant
11    AerSale.
12              THE COURT:  Good afternoon.
13              Okay.  We're before the Court on a discovery hearing, I
14    guess the last one on the case.  I think your discovery cut-off
15    is tomorrow, right?  It's the last one?
16              MR. WORLEY:  It is.
17              MR. McDONOUGH:  Long, strange trip.
18              THE COURT:  All right.  As I recall, let me pull up the
19    materials, I believe, were there issues on both sides or
20    primarily the Plaintiff?
21              MR. McDONOUGH:  Just on Plaintiff, Your Honor.
22              THE COURT:  Okay.  So turning to you, Mr. McDonough.
23              MR. McDONOUGH:  Thank you, Your Honor.  Let's see.
24              May it please the Court.  We have had a list.  When we
25    first submitted the certificate of compliance, it listed maybe
```

1   five different items, we categorized them in five different

2   categories I would say.  We have narrowed and come to agreement

3   on all of the issues, I believe, except for really one with

4   respect to two different products.

5           THE COURT:  Okay.

6           MR. MCDONOUGH:  And I think we've come to an agreement

7   on one of those.  But I just want to get some stuff on the record

8   related to it and representations made by Defendant, and then

9   move on to the more important one.

10          So at bottom, the issue that we have today is when we

11  first brought the complaint for patent infringement against the

12  Defendant and counter-claimant AerSale, we had identified a

13  product called AerSafe as being the accused product, and the

14  installation of AerSafe on several of -- several different

15  versions of aircrafts offered by both Boeing and Airbus.  And one

16  of the documents that was submitted in the materials was the

17  complaint itself.  If it's helpful, I can draw your attention

18  there to Docket 1 obviously.  And if you turn to Page 4 of that

19  document, ECF 4, it has a section on the Defendant's product and

20  services, and states, for instance, in Paragraph 23 that AerSale

21  began developing a competing and almost identical foam-based

22  ignition mitigation system.  AerSale appears to have obtained

23  approvals from the FAA to provide their AerSafe products on

24  several model aircrafts.  And so that's the trade name that they

25  use for the product.  And then again in Paragraph 24, categorized

1    it in the same way.

2         However, in Paragraph 26 we stated that AerSale's

3    AerSafe products are installed on the following aircrafts, and we

4    have a list which, at the time was what we thought to be an

5    accurate list.  In fact, it may have been.  I believe there's an

6    additional aircraft, the Boeing 757, that since the filing of the

7    complaint, and I'm not sure exactly the time, but within the past

8    six months has been approved and is now being sold and had been

9    sold in the US that we contend infringed because it is the same

10   AerSafe product.

11        And so we served discovery specifically targeting the B

12   757 aircraft model, because the drawings and installation process

13   and approval process with the FAA is different from every single

14   aircraft, has to be specifically approved.  And we asked for the

15   documents related to 757 to show installation, how the system is

16   made, what the people have to do to install it on the system,

17   according to the FAA, et cetera.

18        And the impasse here is that AerSale believes that the

19   AerSafe product for the 757 is not in the case because it was not

20   identified in the complaint, it's in Paragraph 26 is my

21   understanding.  Although we did clearly categorize the accused

22   products as the AerSafe products as installed on various

23   aircrafts, now the 757 being one of them.

24        I mentioned two issues at the beginning, and I'm going

25   to touch on the other one.  There's another aircraft model that

1    AerSale would like me not to disclose publicly on the record now,

2    that we have come to understand, or my client has come to

3    understand, is also being offered in the marketplace, an AerSafe

4    product for this particular model of an Airbus.  I've been asked

5    not to put that on the record, but we've agreed to what -- I

6    believe there's a stipulation on that that Mr. Worley can state

7    now is, as I understand it, their position is that this

8    particular model has not been certificated with an STC and is not

9    being sold.  So I guess, Mr. Worley, if you would like to confirm

10   that, if that's accurate at all, I want it in the record related

11   to that particular product.

12          MR. WORLEY:  Thank you, Mr. McDonough.  Thank you, Your

13   Honor.

14          Yes, Your Honor.  For the record, the model is

15   identified in Document Number 8 that Mr. McDonough's team filed.

16   On the second page, last paragraph, they identified two aircraft

17   models:  One, the Boeing 757 and another model.  Our client has

18   asked that it be kept attorneys' eyes only, that that particular

19   model is not in development.  It's a model that was not made,

20   used or sold at the time the complaint was filed.  It's not an

21   accused product and currently they have no product in development

22   for that particular aircraft.

23          So there would be, in AerSale's view, nothing to produce

24   anyway.  But we understand that Mr. McDonough, he just wanted us

25   to make the record that our client has stated that there was no

1       product in development for that other model.

2               THE COURT:  That's fine with me.  But just how does he

3       know about it then, in other words?

4               MR. WORLEY:  I can't speak on his behalf.  They have

5       accused other products that we don't think were -- such as the

6       757.  That was not something that was in existence at the time of

7       the complaint as well, but it's in the complaint.  So I can't

8       speak to their methodology, but it's been represented to me by

9       our client that they have no product in development.  I don't

10      know if they ever spoke about it and considered it, but there's

11      been nothing in development.  There was nothing that was made,

12      used or sold prior to the filing of the complaint.  Again, it's

13      not an accused product, and as we will discuss in regards to the

14      757, there are some Article III jurisdiction issues for products

15      that don't exist at the time of filing of a complaint because

16      each product is different.  It's like previewing -- well, I can

17      stop there.

18              So I believe the parties are in agreement on that now

19      that the record is made.

20              THE COURT:  Okay.

21              MR. MCDONOUGH:  And I'll just finish with my argument on

22      there.

23              MR. WORLEY:  Thank you, Your Honor.

24              MR. MCDONOUGH:  Okay.  So sorry for that.

25              The issue where we're still at an impasse is on the 757.

1    So our position is that the complaint clearly identifies AerSafe

2    and the aircraft models, and the fact that the allegations of

3    infringement at, for example, Paragraph Numbers 42, 45, 46, 47

4    all talk about continuing infringement.

5         For instance, in 45 Defendant has intentionally induced

6    and continues to induce infringement of one or more claims of X

7    patent, and that's the same throughout for the other two patents.

8    And so due to its continuing nature, the fact that they came out

9    with it during the case, we feel like it should be part of this

10   case, right?  Part of it is for efficiency's sake, of course,

11   because the amount of documentation we believe to produce that

12   we're asking for, if it's anything like the documentation for the

13   other products, is essentially a stack of documents they should

14   have collected in one place, should be pretty easy to produce.

15   Damages they would have to do an additional printout of the

16   system and figure out what the sales were.  So we don't think the

17   burden would be too much, and the importance to the case, we

18   think, it is much more efficient to do it in this case rather

19   than us have to file another case against just the 757, which

20   could take years.  Discovery is still open.  We've asked for

21   them, we don't think it will take long to get them.

22        And I think one issue you're going to hear is that we

23   served infringement contentions back in the beginning of this

24   case pursuant to our schedule, and infringement contentions, as

25   I'm sure you're aware, are simply a contention that the

8

1    interrogatories effectively identify the infringement at the time
2    the 757 wasn't being sold so they weren't identified in there.
3    We're happy to amend our contentions prior to the close of fact
4    discovery, which is tomorrow, to identify that in there if that
5    is a sticking point.  We don't think it should be.  Because of
6    the spirit of it, these are the same products just being
7    installed in different aircraft models in the center wing fuel
8    tank.
9         The last point I'll make is that we had an issue in the
10   beginning of this case where the Defendant had moved to stay
11   discovery due to the level of detail in our infringement
12   contentions, and they had stated that because we only had listed
13   one claim of each patent in the complaint, that that's all we
14   could assert in the litigation.  We argue that is exemplary and
15   the language says it's exemplary, and it says one or more claims,
16   and in our contentions we added many claims.  The Court
17   ultimately denied that motion, and we think it is no different
18   than that, really.  In fact, it's a little more simple than that.
19        But with that, I rest.
20        THE COURT:  Step back.  Remind me, what do you mean the
21   Court denied those claims?  Explain that to me.
22        MR. MCDONOUGH:  Sure.  The Defendant had moved in Docket
23   51 to stay discovery at the beginning of this case.
24        Well, let me step back.  So we entered a schedule.  One
25   of the deadlines was the provision of infringement contentions to

1  AerSale, which is a contention that our interrogatory identified

2  which products specifically infringe and how they infringe, like

3  element by element of the claims.  They said that that was

4  deficient, that our contentions were deficient, and wanted to

5  stay discovery until we fixed them and added more detail.  And

6  one of the things they also wanted to do was exclude us from

7  being able to add it.  Like in the contentions we identified

8  probably 50 claims across the three patents.  In our complaint,

9  we identified Claim 1 of each patent and potentially others,

10 right?  And so they said because we didn't specifically identify

11 Claim 1, 5, 6, 8 and 9 in the complaint, that it wasn't part of

12 the case.  And all I was saying is that the Court denied that at

13 Docket 124, that that was not an issue.

14        And my point is that this is a very similar issue, in

15 our view, in that it is a little simpler.  We're adding a product

16 that should be part of the case, that we think clearly is

17 identified in the complaint even though it wasn't developed yet,

18 and due to the continuing nature of the tort alleged, we think

19 for efficiency's sake should be part of this case.  And again,

20 the burden I don't think will be -- should be minimal.  We may

21 hear differently, but based on the productions of the other

22 documents, I don't think it should be a lot of work in light of

23 the prejudice to the Plaintiff.

24        THE COURT:  And with respect to the question now about

25 the new aircraft, assuming you're right, that it doesn't -- I

1    mean, it is still notice pleading.  So assuming it's the same

2    product, the same configuration, it just happens to be an

3    additional commercial article that it's being implanted in, i.e.

4    the 757, the question would be so that issue is within the scope

5    of the complaint.  If you get past that issue and you say well,

6    it's sufficiently within the scope of the case, but then when did

7    you learn of that issue?  When did you learn of the patent?

8         MR. McDONOUGH:  So we, back in December of 2020 -- 2021

9    I believe it was, shortly after the case filed, we served

10   discovery and we had heard about the 757.  My client had heard

11   that it was potentially on the market, right?  So we actually

12   made that part of one of our dispute charts that we submitted to

13   the Court.  Again it was in December 21st of 2021, two disputes

14   ago.  The 757 is listed on there as an issue and they, at the

15   time, represented to us that it was not being sold, offered for

16   sale at that time so we dropped it.  And that's why I want it on

17   the record about the other model, because I don't something

18   similar to happen here.

19        It turns out we found a certificate, STC, in the public

20   record showing that they had a product.  Didn't come out after

21   they made that representation to us, but clearly it was in

22   development at the time.

23        THE COURT:  Remind me what that is?  I'm sorry?

24        MR. McDONOUGH:  STC is a Supplemental Type Certificate.

25   When the FAA approves the installation of a product on an

1   aircraft like a 757, it becomes public record, and then there's a

2   lot of documents that go along with it saying exactly how you

3   have to do it in order to stay airworthy.  And so we found that

4   later --

5           THE COURT:  When?

6           MR. McDONOUGH:  Shortly before we served our discovery,

7   I want to say four months ago maybe.  We served discovery shortly

8   after that, like probably within a month, specifically

9   identifying that.  And the -- sorry, I almost said that on the

10  record.  And the other aircraft model because again, we suspected

11  that maybe it was out there.

12          THE COURT:  You served that discovery about four months

13  ago?

14          MR. McDONOUGH:  No, about three months ago I'm guessing,

15  because we waited 30 days for the response, then we teed this

16  dispute up.  So it's probably been four or five months since we

17  discussed it, and probably four months since we served the

18  discovery.  October 11th we served the discovery.  I'm sorry.

19          THE COURT:  And then they responded, and I guess I have

20  the responses here.

21          MR. McDONOUGH:  Yeah.  In mid-September.  They might

22  have got a short extension, and then we got an extension on

23  submitting the discovery dispute to the Court.  And then the

24  holidays went, and we ended up with this hearing date.

25          THE COURT:  And what request number is it again?

1        MR. McDONOUGH:  So there's several request numbers.  So

2   it is for -- Mr. Williams has a set of RFPs that were submitted

3   to -- it's RFP Number 10, 19, 28, 38, 47, 51, 58 and 67 that

4   identify the B 757.  And then we had several requests that were

5   more broad that didn't specifically identify a model number, but

6   was basically any aircraft with AerSafe on it.  And we had a

7   definition of accused products that included the Boeing 757 and

8   this other model, and they objected to that saying that those two

9   models were not part of the case, therefore not part of the

10  accused products.

11        THE COURT:  Did you try to get this matter on sooner?

12        PLAINTIFF 1:  Yeah, we did.  We were within all the

13  deadlines.  Let's see, we got a one-week extension on submitting

14  the discovery dispute, and then the Friday -- it was due on a

15  Monday, we were supposed to call the Court, would have been 37

16  days, I guess.  And I think maybe the rule's changed now, but at

17  the time 37 days.  The Court -- it was like right at the holidays

18  and we didn't get a call back for a couple days.  I called again,

19  left a message, usually it's same day.  I think people were

20  probably on vacation.  And then probably the first week of

21  January we got a call back and they gave us -- listed the

22  different hearing dates, and we got confirmation by AerSale, I

23  think it was by the next day of when it would work for them.

24  Then we submitted that to the Court.

25        THE COURT:  Okay.  I see.

1          Now, at this point do you have any information that it

2   actually has been placed in the market as opposed to just getting

3   regulatory approval?

4          MR. McDONOUGH:  Yes.  Yeah.  I mean, again, this is

5   stuff that my client has heard and I believe -- I don't think

6   AerSale is contesting that they've made at least one sale of it.

7          THE COURT:  Okay.

8          MR. McDONOUGH:  If I recall right.  But I'm certain, my

9   client is certain, that they have lost bids to AerSale for 757

10  several times over the past few months.  For maybe one time over

11  the past few months.

12         THE COURT:  And so then the issue then that they raised

13  is that it's outside the scope of the case basically.

14         MR. McDONOUGH:  Yeah, because it's not specifically

15  identified in the complaint, which it's not.  But it is -- the

16  AerSafe product is.

17         THE COURT:  I assume this has happened before in patent

18  cases.  Do you have any authority in the patent context where

19  this has been addressed?

20         MR. McDONOUGH:  I don't.  I was looking, there's nothing

21  analogous because it's always very fact-specific, right?  And it

22  depends.  Oftentimes there are local rules in place and we don't

23  have those here.  Like, there's often a final contention deadline

24  which is usually toward the close of fact discovery where you

25  have to -- okay here it is, final.  No matter what happens

1      afterward, these are your contentions.  This is what you say,

2      these are the products and this is the scope of the case.

3              We don't have a deadline for that here, we just have an

4      infringement contentions deadline.  In hindsight we probably

5      should have, but I think within the discovery period, as long as

6      by tomorrow we supplement our interrogatory which is effectively

7      what it is with information we've gained through the case, I

8      think that it should be allowed to be amended, so to speak.

9              THE COURT:  Because obviously if there is a remedy, if

10     it isn't included which is technically a file a new lawsuit.

11             MR. MCDONOUGH:  Right.  And that's what I was saying, we

12     could do that but it's just highly inefficient.  We would have to

13     have to file another case over one product when there's six,

14     seven in here and it's the same branded products.  There are

15     differences from plane to plane, but --

16             THE COURT:  I was going to ask you that too.  Are there

17     configuration differences between -- plane to plane?

18             MR. MCDONOUGH:  Yes, there are.

19             THE COURT:  And could those differences affect

20     infringement or not?

21             MR. MCDONOUGH:  I think they could.

22             THE COURT:  Okay.  If that's the case -- in other words,

23     if there were no infringement -- if it's just a matter of damage,

24     I mean, in the nonpatent world for example, in the trademark

25     world, intellectual property, damages can be accruing and the

1    point in time in when you fix the damage is some time before

2    trial, typically end of expert discovery period for example.  In

3    this case, when is that?  April 28th.  So that's April 28th.

4    Because typically you've got to finalize the expert opinion and

5    so there has to be some deadline.  And often the expert deadline

6    becomes the end of damages because that's the one where the

7    expert is going to fix the amount.

8           MR. McDONOUGH:  Right.

9           THE COURT:  And it is what it is.

10          So here, if it was strictly a damage issue, right?  Then

11   arguably that could be -- the same rule would follow.  The only

12   question though is what if it makes a difference on liability.

13   Is it a liability, potential liability issue.

14          In other words, that's why I asked the question.  The

15   fact that it's installed in a new aircraft in and of itself

16   doesn't answer the question whether or not there's infringement,

17   because let's say it's the same product.  Let's say we were

18   dealing with, you know, I don't know, the entertainment system on

19   the seat, right?  And so now it's the same entertainment system,

20   the exact same technology, it's now being implanted into the 757,

21   being retrofitted.  Your lawsuit is it was fitted on all these

22   newer aircraft, right?  Arguably it's just an additional item of

23   damage, right?  And so therefore, the analysis is just

24   damage-related.

25          Is that what we have here?  Or alternatively, is there

16

```
1    -- it's not just installing the same console, but the
2    configuration of it may affect infringement liability.
3           MR. McDONOUGH:  So it's an interesting question because
4    for each installation, not individual installation for an
5    aircraft, but for each model aircraft there are slightly
6    different configurations of the tank, the center wing tank.  Some
7    of them, they're almost -- I want to say some of them they are
8    basically the same except for some additional piping in the way.
9    I'm not sure that's the case with the 757.  We've looked  at the
10   tank.  It's our contention, of course, that it does infringe or
11   it would have to infringe in the same way that the others do.
12          THE COURT:  Right.
13          MR. McDONOUGH:  And the claims are the claims, right?
14   So the only additional work would be us giving our contentions
15   and showing exactly where we say infringement is with respect to
16   the foam blocks inside 757 tank.
17          THE COURT:  For example, didn't you have as one of the
18   original aircraft the 767?
19          MR. McDONOUGH:  767, yes.  That is actually not an
20   accused product in this case.
21          THE COURT:  Because my recollection of it is that this
22   was an Airbus problem.  Was I wrong about that?  Or maybe because
23   that's where the initial -- there was an inspection that had to
24   be done in like Paris or something?
25          MR. McDONOUGH:  Oh God, yeah.  That never happened.  It
```

1    was in Russia.  Thankfully --

2           THE COURT:  Right.  Before the war.

3           So my impression was that this was an Airbus issue, but

4    that's wrong.

5           MR. MCDONOUGH.  No, no, no.  Boeing and Airbus are the

6    two manufacturers that have models where AerSafe and -- I'm

7    sorry, where AerSale and JetAire provide solutions.  767 is in

8    here.  Yeah.

9           THE COURT:  Okay.

10          MR. MCDONOUGH:  And so the 767, 737, the 777 is in

11   there.  And what we're trying to do now is have the 757.  I don't

12   think that the differences are -- I want to say they're not

13   negligible, there are differences, but I don't think it would

14   require any additional discovery beyond them producing the

15   package that went to the FAA for --

16          THE COURT:  Do you have that?

17          MR. MCDONOUGH:  I do not have that.  It's not public

18   record.  So we have the STC which is like a certificate issued

19   but --

20          THE COURT:  They don't disclose like the plans?

21          MR. MCDONOUGH:  No.  No, they don't.  Those are

22   confidential.

23          THE COURT:  I see.

24          MR. MCDONOUGH:  And an STC is essentially licensable.

25   And so say, for instance, JetAire went and installed, you know, a

```
 1    fuel system, ignition mitigation system in a fuel tank for a 737,
 2    you have to get STC, and you license to STC to that aircraft
 3    owner and they have that as proof and all the paperwork comes
 4    with that, how it was installed, et cetera, so they can show the
 5    FAA this has been modified and this is exactly how.
 6              So no, we don't have the paperwork.
 7              THE COURT:  So you don't have enough information to know
 8    -- they may have, of course, because they have the details, but
 9    in terms of the Plaintiff, you don't based upon that certificate,
10    based on the information you know right now, that you can make an
11    allegation that it definitely infringes without --
12              MR. MCDONOUGH:  I would say yes, 100%, because we know
13    what the tank looks like and we know what steps are required by
14    the patent, which there are some of them that are FAA mandated.
15    We have experts that know how this -- like the only way some of
16    these things can be done, and that is, I think, part of the
17    analysis too, right?  Knowing the tank and everything.  They do
18    argue they don't infringe, so they're going to argue they don't
19    infringe.  But we have, I would, say certainly a Rule 11 basis to
20    say that they do infringe, right?
21              THE COURT:  And remind me again, this has to do with the
22    foam installation in the fuel tank?
23              MR. MCDONOUGH:  Yes.
24              THE COURT:  And what specifically is the patented
25    component of it?
```

1          MR. McDONOUGH:  So there's three patents.  One of the

2     patents focuses heavily on the creation of the kit that goes into

3     the fuel tank, the foam blocks, the type of foam, the foam

4     blocks; and then how an aircraft is defueled, like the process

5     for putting this thing inside the aircraft, and then filling the

6     fuel back up and getting it essentially certified according to

7     the FAA.

8          THE COURT:  So there's a process patent involved?

9          MR. McDONOUGH:  Yeah.  It's not technical, what you're

10    thinking of as a process patent, it's a method.

11         THE COURT:  A method?

12         MR. McDONOUGH:  Yeah.  Yeah.  So there are methods in

13    each of the patents.  The first patent is focused more like on

14    creating the blocks, the foam blocks; cutting out certain things

15    to fit inside the fuel tank and around certain components like

16    fuel pumps, et cetera.  And some of the baffles which are like

17    the structural inside of the tank to give it strength, because

18    they're in the wing, you know, like in the center of the wing.

19    And then there's some that are more focused on just how the

20    blocks are put into the tank itself and the configuration of

21    those, whether they're stacked in a certain way, and there's some

22    other things.  But those are the two primary forms.

23         The second two patents are more focused on exact ways of

24    putting the blocks in, and the first one is more the entire

25    process from kind of soup to nuts to getting into the system,

1     walking away and having the FAA say you can fly this thing.

2          THE COURT:  So then your argument would be that there

3     are defenses to both infringement -- are there invalidity

4     defenses as well?

5          MR. MCDONOUGH:  Yeah, there are.

6          THE COURT:  Right.  So their infringement and validity

7     defenses would be the same for the installation of this product

8     as it is for the other products identified in the complaint.

9          MR. MCDONOUGH:  Yeah.  I wouldn't see them -- they're

10    not going to have new invalidity positions based on this.  They

11    may have some for other reasons, I don't know.  I suppose because

12    we're at the end of fact discovery they also have invalidity

13    contentions of their own that they can update as of tomorrow, but

14    there shouldn't be anything really to adding the 757 or not.

15    That should be an independent analysis.

16          Now infringement, I believe the same defenses would

17    apply, and maybe Regis has another defense here, but I think

18    they're identical.  I can't imagine those changing either just

19    based on the nature of them.  But, you know, I'm sure the

20    Defendant will come up with some reason why it's different.

21          THE COURT:  In other words, to some extent, if you were

22    to see the design specs and the installation specs, which is

23    obviously a big part of the patent, it's not just the design of

24    the product itself, the manner in which it's installed, all that

25    is in the FAA certification material.  But it's possible that

1    they're materially different or at least have raised new issues

2    or not, right?

3          MR. MCDONOUGH:  It is possible.  I can't say it's not

4    possible.

5          THE COURT:  Because even though the 67 and 57 are

6    similar, they're not exactly the same in terms -- clearly not in

7    terms of size.

8          MR. MCDONOUGH:  Correct.

9          THE COURT:  And the size of the center tank is much

10   bigger.

11         MR. MCDONOUGH:  Correct.

12         THE COURT:  Yeah.  Okay.  All right.

13         Let me turn to the Defendant, let the Defendant state

14   his position.

15         MR. MCDONOUGH:  Thank you, Your Honor.

16         MR. WORLEY:  Thank you, Your Honor.  There's a lot to

17   unpack there.  Is there any place you would like me to start or?

18         THE COURT:  What's your best argument I guess.  Well,

19   actually start with my initial theory which is that there are

20   plenty of examples where this could just be deemed an additional

21   damage.

22         MR. WORLEY:  Thank you, Your Honor.

23         THE COURT:  And so therefore there's little prejudice to

24   it because the expert period doesn't end until the 28th.  And so

25   we're just potentially adding up -- there couldn't have been that

1    many sales because the product was just certified, right?

2         MR. WORLEY:  Correct.  And first of all, I'm not aware

3    if there are any sales.

4         THE COURT:  Oh, in which case then -- I mean, that's the

5    other thing.  I mean, if there are no sales, how relevant is it?

6         MR. WORLEY:  I don't want to make Mr. McDonough's

7    arguments for him, but there could be infringement from the offer

8    to sell, right?  So again, I don't want to make his arguments for

9    him, but our position is one, as Mr. McDonough concedes, every

10   aircraft is different.  There are three patents in suit.  The

11   first one does look more at the process.

12        What Mr. McDonough did not mention to the Court was that

13   the special master found that claim terms in that patent were

14   indefinite and as a result the patent was invalid.  Judge Gayles

15   adopted in full that recommendation.  So in our view, the first

16   patent is out of the case.  I know Plaintiffs are continuing to

17   pursue that, I believe at their own peril.

18        But the second patent and the third patents are very

19   specific involving the shapes of the foam blocks.  The second

20   patent is a method patent, and it discusses how to put in foam

21   blocks and says, you know, a first foam block with a particular

22   kind of shape, you know, cutouts at the top; a second foam block

23   with cutouts at the bottom; a third foam block that goes in

24   between with a channel void to reduce weight.  So even though

25   it's a method, it very, very specifically talks about the shapes

1    of the blocks that are being installed as part of that method.

2         The third patent is a product patent and is describing a

3    system of blocks that includes one block as one part of it that

4    has cutouts at the top to go around the upper stiffeners, cutouts

5    at the bottom to go around the lower stiffeners, and there are

6    cutouts on the sides.  So this block is a very specific shape.

7         So again, each aircraft is different because of the size

8    and configuration of the tanks, the layout, whatever foam

9    systems, be it blocks or otherwise, are going to be different. So

10   each model is very distinct, it's not the same product, it's not

11   the same configuration.

12        To the extent Mr. McDonough was discussing, you know,

13   the AerSafe product, that's like saying well, I've accused Toyota

14   of infringing because they make cars.  Well, you know, the Toyota

15   Corolla and a Toyota Tundra and a Tacoma, they may all be motor

16   vehicles, they may all have engines, but they're all very

17   different.  And in the same way that some of our products may be

18   similar to others, each one is individual.  Each block

19   configuration in particular is unique to the aircraft.

20        And we would strongly disagree with Mr. McDonough's

21   representation or with JetAire's representation that these

22   products are identical.

23        THE COURT:  Since you're focusing on the method patent

24   just as an example --

25        MR. WORLEY:  Yes, sir.

24

1        THE COURT:  -- explain to me why, for instance, to the

2    extent you know obviously, but for now explain to me why a method

3    patent that might apply to the 767 wouldn't be materially the

4    same to the 757.

5        MR. WORLEY:  Because in this case, and I'm sorry I don't

6    have the patent in front of me, it is an attachment to the

7    complaint of Exhibit 1, but the method discusses not just install

8    foam in the fuel tank, it will say install a system containing

9    very specific blocks.  So a first block that has a plurality of

10   cutouts at the top of the block to accommodate -- configured to

11   go around upper stiffeners in the fuel tank.  Taking a second

12   block with cutouts configured to go around the lower stiffeners

13   of a fuel tank and then installing that.  Then taking a third

14   block that has a channel void to reduce weight, and then

15   installing that in a verticle column in between the first and

16   second blocks.

17        So as an example, all the patents in suit provide an

18   example of how foam blocks are installed in, I believe, it's

19   Figure 5 and Figure 6.  And these foam blocks basically look like

20   a slice of bread or a loaf of bread that's been sliced.  So you

21   have a bunch of long, thin blocks with cutouts in each one.  When

22   it goes into the tank, it will fill up the entire cross-sectional

23   area of the tank.  In the second and third patents --

24        THE COURT:  Are they vertical blocks?  Is it more like

25   vertical blocks?

1        MR. WORLEY:  They look like slices of bread for a better

2    example, Your Honor.  If you could imagine a single block that

3    will fit inside a fuel tank that goes from the top all the way to

4    the bottom, from one side to the other.  So it's a single block

5    that will fill up that particular cross-section of the fuel tank.

6        And in the second and third application, the second one

7    is a continuation of parts.  They added new material, and that

8    material carried over into the third patent.  They show a

9    completely different configuration where instead of large slices

10   of bread, these are more of Legos stacked one on top of the other

11   in a verticle column.  So just the patent itself shows there can

12   be many different configurations of foam that can be cut and

13   installed into a fuel tank.  There are at least two very distinct

14   configurations shown in the second patent itself.

15       So even looking at the second patent, if you were to

16   install the system of, you know, the Figure 5 that has a big

17   slice of bread, that would not infringe the claims because the

18   claims require a vertical stack of at least three blocks having

19   certain configurations.  So we would certainly disagree strongly

20   with JetAire's contention that all the AerSafe products are the

21   same.

22       THE COURT:  To some extent, accepting the premise of

23   what you're saying, right?  That they're just not going to be

24   different, they're too dissimilar to be able to just lump them in

25   this case, don't I need more information to make a conclusion on

1    that?

2          MR. WORLEY:  No, Your Honor.  Unless the conclusion is

3    it's not part of the case, you shouldn't need any more

4    information.  But there is -- Mr. McDonough -- strike that.

5          I don't think AerSale -- sorry.

6          Third time's a charm.  JetAire did not find a case that

7    I'd like to bring to Your Honor's attention, it's Medical

8    Components Incorporated versus Osiris Medical, Incorporated.

9    This is a case from the Western District of Texas from December

10   29, 2016.  The number is 226 F Supp 3.D 753.  And this case is

11   not identical, but very similar to the situation we have here.

12   That case was a declaratory judgment action where there's

13   somebody who filed for declaratory judgment of noninfringement

14   against some patents that were being asserted by the defendant in

15   that case, and then at some point they tried to add additional

16   products which were not in existence at the time the complaint

17   was filed.  And the court discussed the issue of Article III

18   jurisdiction, and noting that the court had to consider each

19   product individually and said otherwise, there's a risk of

20   providing an advisory opinion on one product based on an actual

21   controversy involving another product.  And it continued at one

22   point stating that -- in that case as well, again the products

23   did not identify at the time the original complaint was filed.

24   And the case, if I can read my writing, said the patent owner can

25   only assert its patent rights against a product that exist at the

1    time the suit was initiated.  That's citing a federal circuit

2    case, Matthews International versus BioSafe Engineering, 695 F.3d

3    1322.  The court, again, focused on each product being distinct

4    and technically different, which we do have here.  It's not, as

5    Your Honor said, an entertainment system that's being taken out

6    of one airplane and being put into another, it's the same system.

7    In this case we have unique foam products that are each uniquely

8    custom tailored for the fuel tank at issue.

9           THE COURT:  How do I know that though?  In other words,

10   how do I know that?

11          MR. WORLEY:  It can be no other way, Your Honor.  Each

12   fuel tank has a different size and different shape.  The foam

13   that is being used to -- that they cut to put in has certain

14   dimensions.  And depending on the size of the tank, it might not

15   be tall enough to go from top to bottom as would be required by

16   the 541 patent.  So again, because each tank has a unique shape,

17   and the patents are very particular in discussing and requiring

18   the shape of the blocks to have a certain configuration, as each

19   tank is different, I will represent that each of our AerSale

20   products that have been accused so far has a different

21   configuration because they have different tanks.

22          THE COURT:  That Waco case that you told me about --

23          MR. WORLEY:  Western District of Texas?  Medical

24   Components?

25          THE COURT:  Western District case, not Waco, I'm sorry.

1    The Western District of Texas case, was that conclusion on a

2    discovery dispute or was there a procedural posture in that case?

3           MR. WORLEY:  Summary judgment on behalf of Article III

4    jurisdiction.

5           THE COURT:  Right.  Right.  And then the federal circuit

6    case that it relies upon?

7           MR. WORLEY:  I did not have Wi-Fi access today, Your

8    Honor.  I was unable to look at that detail.

9           THE COURT:  It is more raw, so let me actually pull up

10   -- people love to cite district court opinions, and I always tell

11   people that we're not that smart.  But if the federal circuit has

12   spoken on it --

13          MR. WORLEY:  Well, the federal circuit citation is 695

14   F.3d 1322, specifically at Page 1331 according to the Western

15   District of Texas.

16          THE COURT:  Hold on one second.

17          MR. WORLEY:  My apologies, the USO did not have Wi-Fi

18   working.

19          THE COURT:  Last versus Bank of America?  Is that the

20   name of the federal circuit case?

21          MR. WORLEY:  I have Matthews International versus

22   BioSafe Engineering.

23          THE COURT:  I typed it wrong.  695 F.3d?

24          MR. WORLEY:  Yes, sir.  Yes, Your Honor.  1322.  I may

25   have a scrivener's error in my notes.

```
 1              THE COURT:  I have it here.

 2              MR. WORLEY:  Page 1331 is cited.

 3              THE COURT:  The problem with the federal circuit case is

 4    it found that -- it contemplated the possibility of a

 5    supplemental pleading.  But the problem is that the original

 6    patent over which the lawsuit was filed, there was not sufficient

 7    evidence of immediate infringement to know that a dec action

 8    arose.  So basically they found that the original patent that was

 9    in the complaint didn't give rise to jurisdiction.  So having

10    failed to have jurisdiction, the fact that now you have a new

11    patent, what they called a supply patent?  A system patent.  A

12    system patent then did not issue until after the complaint.  So

13    then the plaintiff couldn't then just proceed with a system

14    patent because there was no jurisdiction to begin with.

15              So it's a little different, right?

16              MR. WORLEY:  Yes, Your Honor.  I would point out as well

17    -- I'm sorry.

18              THE COURT:  Let me pull up the Western District case now

19    that I'm at it here.

20              MR. WORLEY:  226.

21              THE COURT:  F Supp 3.D, right?

22              MR. WORLEY:  F Supp 3.D.  Yes, sir.  Yes, Your Honor.

23    753.  And pages 762 to 763 have the meat.

24              THE COURT:  Yeah.  A bit of an over-statement.  It cites

25    the Matthews case for the proposition that a patent owner can
```

1    only assert its patent rights against the product that exists at

2    the time that the declaratory judgment filed suit.  That's not

3    what the Matthews court held.  I mean, this matter was ultimately

4    adjudicated on summary judgment, and that makes sense, especially

5    for example -- I mean, this judge was looking at it from the

6    standing proposition of Article III subject matter jurisdiction

7    standing.  And if you read the opinion, he's not just looking at

8    the face of the claim, he's looking at what the record existed on

9    summary judgment.

10            And so taking that at face value, given that the expert

11   cut-off is April 28th --

12            MR. WORLEY:  I believe the reports are due March 10th.

13            THE COURT:  Oh, the reports are due March 10th.  So as a

14   practical matter --

15            MR. WORLEY:  Yes, sir.

16            THE COURT:  -- don't I have to give -- since we do have

17   a little bit of time, and you're telling me there have been no

18   sales, there may have been attempted sales and they may have been

19   offered to sale as you point out and that is potentially

20   infringing activity, right?  An offer to sell?

21            MR. WORLEY:  Potentially.

22            THE COURT:  But given the limited amount of volume of

23   data that we're talking about, the most primary data being what

24   is the design, what is the design package that was approved by

25   the FAA --

1          MR. WORLEY:  May I, Your Honor?

2          THE COURT:  -- why don't I order that produced now and

3    then punt on the ultimate issue for -- this is all pretrial now,

4    hopefully Judge Gayles will decide on summary judgment or

5    alternatively a motion in limine.  I suppose it could come up in

6    that way too.

7          But motions for summary judgment, which I think are due

8    May 19th, if his expert looks at that material and decides you're

9    right, they're materially different, I can't look at this and say

10   in one week it infringes or not, that's the answer because he

11   won't be able to if it's a legitimate expert, right?  You're not

12   going to be able to do that in a day, right?  So if you determine

13   that there are material enough differences, he won't be able to

14   include it in his expert report on March 10th, in which case the

15   whole thing is moot, right?

16         But on the other hand what if he concludes, contrary to

17   your side's assessment, so this is the same thing, the only

18   difference is -- I know this is not real, but it's supposed to be

19   a 4-by-5 and now it's a 5-by-6.  But other than the size, the

20   installation process is exactly the same.  Again, I'm not saying

21   that, I'm just -- hypothetically, right?  What if he can make

22   that conclusion and include that in his March 10th report?  You

23   see my point?  It's possible, then there's no prejudice.

24         On the other hand, if he can't, absent an extension of

25   deadlines, the matter can't be presented in this case, in which

1     case he has to file a new lawsuit.

2          But you see my point?  To some extent at the very least

3     doesn't the Plaintiff's expert have the right to evaluate your

4     position on the material differences that this would require a

5     new lawsuit, new assessment?  It's not just a different iteration

6     of the same product.

7          MR. WORLEY:  The answer, Your Honor, is no, we do not

8     believe that the expert has the right to look at our client's

9     technical documents without a Rule 11 basis.  Our client

10    understands from what's been discussed in the industry that

11    Mr. Williams, the owner of JetAire, initiated this lawsuit based

12    on the sole basis that AerSale uses a foam and ignition

13    mitigation system, and has taken the position that anyone's use

14    of foam as ignition mitigation would infringe his patents,

15    despite the fact that foam has been used for ignition mitigation

16    since the 1960s.

17         If Your Honor may recall, back in 2021 we sought

18    discovery from JetAire regarding its pre-filing investigation.

19    Your Honor denied that discovery, keeping the option open until

20    the end of the case if we were to prevail.  We've already

21    invalidated one of his patents.

22         Based on the claim construction, we do not see a way

23    forward that JetAire can proceed.  I'm sure JetAire will offer a

24    different view, we don't see it.  What we see now is JetAire

25    realizes it as a losing case and it's on a fishing expedition

1    trying to find something to salvage its claims.  And we've

2    produced many documents, a large volume of documents.  If we were

3    to continue now to add a whole new aircraft, it would be an

4    additional large volume of documents, something we'd have to get

5    our expert up to speed on within the next two weeks and, you

6    know, obviously find the documents, collect them, produce them,

7    which I don't believe can be done before tomorrow, and certainly

8    it would be a significant challenge to have it done in any

9    reasonable amount of time for an expert to then review those,

10   consider them, and I do believe it would be a very significant

11   burden.

12           THE COURT:  My understanding was that those materials

13   would be presented to the FAA, and the FAA would review them to

14   issue the certificate.  So it's a finite place to go.  Am I

15   wrong?

16           MR. WORLEY:  As I've learned in this case so far, Your

17   Honor, there's a lot of give and take, a lot of correspondence

18   going back and forth between an applicant seeking to get a

19   Supplemental Type Certificate and the FAA.  There are a large

20   volume of documents, and they have then collateral documents that

21   then take off from those.  So it would be a larger volume of

22   documents, Your Honor.

23           THE COURT:  Do you know how much?  Do you know?

24           MR. WORLEY:  I don't have a number.  I know that as

25   we've reviewed the STC filings from JetAire and the ones -- I

34

1   haven't looked so much at the documents that our client has

2   produced, but I've seen JetAire's.  They're numerous and

3   certainly in the thousands of pages.  Some of the technical

4   documents, for example, there will be one technical document,

5   just one single document that will have the shape of every single

6   block, and that document itself may be many hundreds of pages

7   where each page shows a single block and the configuration of

8   that block, and there may be thousands of blocks in the tank.  So

9   in the case of the second two patents, the 541 and the 109

10  patents, we need to go through and look at each and every single

11  block to see if there is, for instance, the cutouts that are

12  described at the top or the bottom or on side or a channel void.

13  So it would require, again, review of potentially thousands of

14  images of blocks.  And then if there's a revision, we might have

15  another set of documents, Revision A or Revision B, that shows

16  another set of blocks slightly different and see where the

17  changes are.  So something that may have existed in Revision A

18  has now changed to Revision B.  So it's not a trivial amount of

19  work, Your Honor.

20          To the extent that JetAire is suggesting that there may

21  be potential for another lawsuit, we think that would be the way

22  to go.  If they want to bring another lawsuit, there's already

23  been a claim construction in this lawsuit, we're near the end.

24  This is not the time to hit the reset button, add a new cause of

25  action for a brand new product.

 1          THE COURT:  But it wouldn't be a new cause of action.  I

 2   mean, it would be the same cause of action.

 3          MR. WORLEY:  There would be a new product that would be

 4   involved, new claim charts, because each of these systems are set

 5   up differently and we're adding work at literally the tail-end of

 6   discovery.

 7          To Mr. McDonough's point earlier about the 757, I don't

 8   recall any prior conversations or the 757 coming up at any point

 9   in this case until this latest round of discovery was served in

10   October of last year.  If they occurred, I don't recall it, but I

11   have zero recollection of the 757, and I did a word search of my

12   files, did not find anything on the 757 until this latest round

13   of discovery.

14          THE COURT:  On the other hand, I guess to some extent

15   doesn't the fact that the first patent's invalidated narrow what

16   the scope of the dispute is about?

17          MR. WORLEY:  Not according to JetAire, Your Honor.  They

18   are continuing to assert it.

19          THE COURT:  According to you.

20          MR. WORLEY:  According to us, yes.  That's why we

21   welcome a second suit.  The first patent won't be there.  We

22   don't have to worry about claim charts regarding this product,

23   the 757.  We're not going to have to worry about focusing in on

24   each and every step of that process as it relates to the 757.

25          THE COURT:  But I don't understand what you mean.  In

1    other words, say I told them as a matter of discovery I'm just

2    not going to reopen -- not reopening discovery, but basically I

3    wouldn't grant them any relief as a matter of discovery because

4    it's just late, the whole thing is late and we don't have to --

5    if you think you have another lawsuit, you file another lawsuit.

6    He would file another lawsuit, right?  And he would include the

7    original patent.  Why couldn't he?

8            MR. WORLEY:  Well, we think the original patent -- at

9    the conclusion of this case --

10           THE COURT:  It won't be concluded.  He files the lawsuit

11   tomorrow, right?  I tell him no, you're not going to be able to

12   -- he can go walk across the street, file a new complaint, right?

13   And he would be asserting patent Number 1, 2 and 3, right?

14           MR. WORLEY:  JetAire has certainly shown propensity to

15   be very aggressive in its understanding of the law.

16           THE COURT:  Right.  And because they've lost in front of

17   Judge Gayles on that point; Judge Gayles deemed it, together with

18   the special master, invalid, right?

19           MR. WORLEY:  Yes, sir.

20           THE COURT:  And so technically that's not a final

21   decision.  Theoretically this case could proceed, win or lose, on

22   the method patent.  Even if he wins on the method patent, he

23   could still appeal the invalidation of the first patent, right?

24           MR. WORLEY:  Correct, Your Honor.

25           THE COURT:  And so the new lawsuit would be proceeding

1    potentially in front of a new judge all while this matter is

2    being adjudicated, right?  And the reason I ask that is in terms

3    of the prejudice to the Defendant, how is that necessarily a

4    better situation?

5            MR. WORLEY:  We strongly believe that a second lawsuit

6    on these patents would not be filed for reasons I'm not at

7    liberty to discuss.  That came up during a deposition of their

8    30(b)(6) witness over the past two days.

9            THE COURT:  Well, that's a good point.  In other words,

10   things are developing is what you're saying that would make that

11   unlikely.

12           MR. WORLEY:  Extremely unlikely.

13           THE COURT:  On the other hand, clearly if he goes across

14   the street and files a new lawsuit, notwithstanding your position

15   he's going to get discovery of the 757 material that I'm talking

16   about, right?

17           MR. WORLEY:  Presumably, Your Honor.

18           THE COURT:  Yeah.

19           MR. WORLEY:  But I would note that in this case --

20           THE COURT:  So where's the prejudice then?  In other

21   words, I'm not saying you're wrong, right?  I'm not saying that

22   either because the expert can't come up with an infringement

23   theory in time, or it's too different from the original one so

24   that really should be a new cause of action.  So either on an in

25   limine or motion for summary judgment it will get excluded.  Even

1  going along the lines of this judge in El Paso, there's actually

2  no Article III  standing for it, right?  Which is an even more --

3  it's a different argument than just simply it's too late, right?

4  The issue would be what's the prejudice?

5          MR. WORLEY:  Well, putting aside that the deadline to

6  amend -- to move to amend the pleadings was June in 2021,

7  although we have a discovery cut-off coming up right around the

8  corner, the parties -- I will say Mr. McDonough has been

9  extremely cooperative with working with us to schedule

10  depositions.  But we have a number of depositions that are still

11  scheduled to occur over the next several weeks, two weeks?  Three

12  weeks?

13          MR. McDONOUGH:  Three weeks.

14          THE COURT:  You mean of the experts?

15          MR. WORLEY:  No, Your Honor, of fact witnesses.  We had

16  our first deposition over the past two days.

17          THE COURT:  How long has this case been in discovery?

18          MR. WORLEY:  Too long, Your Honor.  It was filed in

19  December of 2020.

20          THE COURT:  And you just got around to deposing people

21  last week?  How is that possible?  What is it about lawyers that

22  they do not want to take a deposition until it's the last week of

23  the cutoff.  I don't understand.  How often have I told people?

24  You will learn so much more.  Look what you just told me.  You

25  just told me that you deposed somebody the other day, and all of

1   a sudden all sorts of new revelations have come to light.

2   Wouldn't that have been useful like two months ago?

3           MR. WORLEY:  It would have, Your Honor.

4           THE COURT:  So I don't understand.  Bottom line though,

5   in that case if that's the case where you all are agreeing that

6   you're not done with fact discovery, right?  So where is the

7   prejudice?

8           MR. WORLEY:  The prejudice is --

9           THE COURT:  It would be different if you told me I just

10  deposed 10 people; discovery, as a practical matter, is over and

11  here he is trying to come up with some new theory.

12          MR. WORLEY:  For the Defendant discovery is over, Your

13  Honor.  We have no more depositions planned.  We have no more --

14  we were accommodating Mr. McDonough to take some depositions that

15  he's seeking.

16          THE COURT:  Okay.  I misunderstood.  So you're done with

17  your discovery?

18          MR. WORLEY:  We are done, Your Honor.

19          THE COURT:  But you're agreeing to his discovery.

20          MR. WORLEY:  Yeah.  And again, we have a good working

21  relationship and we are trying to accommodate him, but we do see

22  this as sort of a Hail Mary at the end where we're done and we're

23  now looking at a potentially a whole new product that we now can

24  take no discovery for, we can't serve any additional discovery

25  requests, document requests, interrogatories, anything else.

1      THE COURT:  Right.  Well, in fairness he doesn't know

2  whether or not he can make an infringement argument.  He doesn't

3  have enough information.

4      MR. WORLEY:  His client apparently believes that if

5  there's foam, there's infringement.

6      THE COURT:  But that in this case has already been

7  established as not being sufficient, right?  Otherwise the first

8  patent wouldn't have been invalidated.

9      MR. WORLEY:  The first patent was invalidated based on

10  some of the words of the patent that just were unclear, what we

11  would call indefinite.

12      THE COURT:  So the Plaintiff's theory of "if it's foam

13  it's mine", it's still viable based on the current two patents

14  remaining?

15      MR. WORLEY:  It certainly hasn't been adjudicated by

16  this Court.

17      THE COURT:  Okay.  And it's going to be at summary

18  judgment I take it.

19      MR. WORLEY:  Presumably, yes.  We have a number of

20  defenses that we will be presenting, and some we think are

21  certainly very clear-cut and should be dispositive.

22      THE COURT:  So you see why I'm skeptical that I'm not

23  allowing him to get it because you may be able to make that

24  argument.  And if that's the case, you may very well knock this

25  out too now.  You see, in the interests of justice, to the extent

1    you're correct, you might be able to do that for the 757 as well.

2          MR. WORLEY:  Your Honor, if I may be so bold, to the

3    extent I'm correct, if we kill their patents then we're much more

4    efficient killing it with the case as it is than adding a whole

5    new product, having a whole bunch of more discovery and then

6    killing the patents.  Now we just have a whole bunch of extra

7    work piled on to AerSale that is unnecessary because we think the

8    information we have is certainly helpful to invalidate the

9    patents.

10         Now, I'm sure Mr. McDonough and JetAire will have a

11   different view, but we see this, again, as a large burden at a

12   time where all the lawyers are extremely busy trying to take

13   depositions, and wouldn't have the time to meaningfully look at

14   the documents and help prep the experts to orient them.

15         THE COURT:  And on that note, his report is not due

16   until the 10th.  Your report is due presumably April 30th?  April

17   10th or so?

18         MR. WORLEY:  I don't recall the dates.

19         THE COURT:  Can you pull up the pretrial order, Maedon,

20   on the expert?  I think Judge Gayles has a specific -- my

21   recollection.  Yeah, the one with the last pretrial deadlines

22   that includes the expert deadlines.  Does he have a rebuttal

23   period?

24         COURTROOM DEPUTY:  Exchange of rebuttal expert witness

25   summaries and reports April the 7th.

```
 1              THE COURT:  April 7th, I think.

 2              MR. WORLEY:  It would require attorneys to generally

 3    review the documents before they were produced just to make sure

 4    there's nothing --

 5              THE COURT:  How would it be privileged between you and

 6    the FAA?

 7              MR. WORLEY:  I don't know what else JetAire has been

 8    seeking.  My understanding is they were seeking a broad range of

 9    documents.  For instance, they're trying to include the 757 as

10    part of the accused products.  Discovery as to the accused

11    products shows up in a number of discovery requests.  So I don't

12    believe he limited his requests to just, you know, a package sent

13    to the FAA.  And therein lies the problem.

14              THE COURT:  Oh, that's all I'm limiting it to.  I see

15    your point.  I'm not compelling -- for some of the reasons you

16    said, I'm not necessarily compelling that.  In other words, I'm

17    not going as far as -- I'll hear him out, but my inclination was

18    not to just do all out discovery on -- because that would require

19    reopening of discovery.  Judge Gayles is not going to reopen

20    discovery, and so there is an issue as to whether or not this is

21    -- as I indicated earlier, there are plenty of cases where

22    additional sales of infringing product, you don't have to file a

23    new lawsuit every time there's a new sale.  You don't look at it

24    from an Article III point of view as to only those sales that

25    were made on the date of complaint, right?
```

1        MR. WORLEY:  Yes, Your Honor.  If this was a chip that

2   was being put in different computers, right?  I would fully

3   agree.

4        THE COURT:  That's right.  So to some extent, the cart

5   is before the horse before I authorize that.  But I'm letting him

6   at least get -- before we hit a home run on this, I'm just

7   getting him to first base.  I'm not contemplating a full-scale

8   production because I'm dealing with this now the day before fact

9   discovery, although I still have some time for expert discovery.

10  Okay.  There's not much I can do, but I can certainly do that

11  because that part of it seems to me discrete, it establishes a

12  basis of information given all the discovery that the Plaintiff

13  already knows about, he bases information for his expert to

14  conclude does it not or does it infringe a patent.  You see my

15  point?  And there's no prejudice to the Defendant because the

16  remedy for the Plaintiff is to file a new lawsuit, and he would

17  get the same documentation anyway.  So you see my point?

18        Whereas it's possible, if your representation is right,

19  that basically this makes a difference.  And by the way, you know

20  about the lawsuit, your client knows about the lawsuit, right?

21  So why would you knowingly patent a product -- excuse me, install

22  a product in a way that's going to trigger an infringement claim?

23  Potentially there are material differences in how this is being

24  done.  We don't know, right?  But to some extent, I can't make a

25  judgment on that answer, I can't just take your representation at

1     face value.

2          So what do I do about it?  Well, I can have discrete

3     production, his expert can assess it, and then once his expert

4     assesses it, and it puts -- let's put it this way, on March 10th

5     he's either going to include the 757 or not.  If he doesn't

6     include it, the whole thing is moot, right?  If he does include

7     it, well then you may have some remedies.  Number one, at that

8     point you could seek to exclude it, but then at least we have

9     some basis of knowledge.  You could seek to reopen discovery if

10    he insists on not striking that part of the opinion.  There's all

11    sorts of things that I can do.

12         But I would be a little bit more informed than just

13    simply hey, a product like this has been installed on a 757 now

14    or is authorized to be installed.  You see my point?

15         MR. WORLEY:  I do see your point, Your Honor.  And

16    certainly one of AerSale's concerns is how the case has proceeded

17    so far.  We did discuss earlier the infringement contentions that

18    were filed -- not filed, they were served and ultimately filed by

19    the parties as part of other motions.  But those infringement

20    contentions were made prior to the time they had any plans or

21    documentation, and they were just a loose collection of pictures

22    from websites.  There were some cutaway views of a tank with

23    cartoon drawings of blocks saying "we think it looks like this

24    and we think all systems are the same."  And frankly, Your Honor,

25    we think all JetAire is going to do is take that same chart and

1    at the first page say you know, this would apply to certain

2    aircraft, they'll just add one more aircraft.  We certainly think

3    that would be improper.  We think their charts are already

4    improper.

5            But again, this goes to Rule 11.  They have not produced

6    any showing in an infringement chart of what our blocks are.

7    They have not -- excuse me, they've not supplemented their

8    infringement charts since having our client's material.  They

9    continue to rely on cartoon drawings and frankly, you know, we

10   tried to address this early as I recall, no?  Okay.  But we

11   certainly raised it with Plaintiffs our issues with the chart,

12   and we were very skeptical that we're going to get any type of

13   meaningful infringement charts regardless of whatever is provided

14   on this case.  We haven't had them so far.  We haven't had

15   supplemented charts so far, and we have no reason to believe that

16   if our client was forced to go through more discovery we're going

17   to get anything other than the same set of charts with one

18   additional aircraft added to the front page.  And those charts

19   are somewhere in the record.  I'm afraid I don't have the docket

20   number, Your Honor.

21           THE COURT:  Okay.  In other words, what you're saying is

22   that those were deficient because they were -- okay.

23           MR. WORLEY:  Yes, sir.

24           THE COURT:  Did you seek any relief on that?  Do you

25   have any -- under the Court's order, under his pretrial order,

1    does he have like patent provisions?

2         MR. WORLEY:  I don't recall any patent provisions and as

3    I sit here now, I can't recall exactly how we addressed it at

4    that time.

5         THE COURT:  Okay.

6         MR. WORLEY:  But regardless, there's been nothing that's

7    been supplemented.  At least when these charts were produced, at

8    the top they said preliminary infringement charts, despite the

9    fact that the scheduling order only set out a single date for

10   infringement contentions.  And so what we have was marked as

11   preliminary.  They haven't been revised and they still -- there's

12   nothing that was included in those charts that were from our

13   discovery that our client has produced.  Again, they're images

14   from web pages and generic pictures that were found online that

15   were not specific.

16        THE COURT:  Putting aside the 757 problem, where would

17   the remedy be in the normal course then?  In other words,

18   obviously then his expert disclosure is going to be based on the

19   original infringement theories, right?  Or maybe not.  Maybe the

20   expert disclosure's going to give you a lot of information that

21   you hadn't considered before.  Or maybe tries to fix that hole.

22        MR. WORLEY:  That's the problem, Your Honor, is normally

23   we do have a set of infringement charts that the parties can look

24   at, their experts consider, and part of the discovery process is

25   going through, poking holes in those charts.  We have not had

1    that opportunity, still haven't had the opportunity.

2           And to your question, Your Honor's question as to what

3    is the normal course of events, it does vary by court as Mr.

4    McDonough noted.  Some courts have patent rules and you have to

5    have certain -- there's a time for preliminary charts, there's a

6    time for final charts.  I think we would be in agreement, both

7    parties, that if we could go back and do the scheduling order

8    over, we would put in probably preliminary and final charts.  But

9    there was just time for one set of infringement charts, one set

10   of invalidity charts --

11          THE COURT:  So why isn't he stuck to the chart that he

12   produced?

13          MR. WORLEY:  We think he should be, and we think they're

14   deficient.  But our problem is that if --

15          THE COURT:  In other words, if he's stuck with the

16   infringement chart that he produced and that has a consequence of

17   either, for example, the Judge may find for summary judgment

18   purposes that's not sufficient to state a cause of action, right?

19   To sustain a claim, it's too broad or whatever, isn't that your

20   remedy?

21          MR. WORLEY:  Well yes, Your Honor.

22          THE COURT:  I mean, you could have pursued it as a

23   discovery matter, but you chose not to.  Which is not an

24   unreasonable to do, right?

25          MR. WORLEY:  Well, we certainly did try to get discovery

1    of the pre-filing investigation and --

2         THE COURT:  Well, that's a different issue.  So you even

3    want to go further back.  You, at the very least, know what their

4    investigation is based upon their infringement chart, initial

5    one, right?  And so presumably you've deposed the Plaintiff now.

6         MR. WORLEY:  We have.

7         THE COURT:  And whoever technical people that they're

8    relying upon.

9         MR. WORLEY:  That's for expert discovery, Your Honor.

10        THE COURT:  Okay.  So you see what I'm saying?  The

11   expert discovery process may fill in the gap that you can then

12   rely upon or not.  But you see my point?  That issue is going to

13   be the case whether I include this 757 discovery or not.  Do you

14   see what I'm saying?

15        MR. WORLEY:  I understand, Your Honor.

16        THE COURT:  Yeah.  So I hear what you're saying, but I

17   don't know that this is consequential, because ultimately you may

18   be working off of their expert report and then seeking remedial

19   relief from that.  That may be the jumping off point, right?  Or

20   you may decide hey, we're going on summary judgment now based on

21   this and so no harm no foul.  All of that is within your

22   consideration.  So this 757 issue I'm not necessarily sure it's

23   linked.

24        So bottom line is -- well, let me stop with you and go

25   back to counsel for the Plaintiff.  Given how late we are in the

1   period and on the representation that we don't really have any

2   sales, we only have an approval, what's wrong with my compromise

3   which is I'll get you the FAA materials, but that's it for now.

4            MR. McDONOUGH:  Your Honor, thank you for hearing me

5   again.  I think that compromise is fine.

6            And just give me a minute here.  You know, after the

7   amount of things that were said about me while he was up here,

8   and the improper things I've allegedly done, let me just say,

9   going back there's at least three e-mails that are in your inbox

10  where we specifically identify the B 757 technical documents as

11  missing, right?  Here's one of them right here.  They weren't

12  filed because they were sent along with the dispute chart kind of

13  letting the Court know what was in dispute.

14           THE COURT:  When was that sent?

15           MR. McDONOUGH:  This one is dated January 7, 2021.  I

16  think that may be wrong.  I think this was December 27, 2021.

17  But it was in December, and then there was another one in August.

18           THE COURT:  Because you had a suspicion it could have

19  been installed in a 57.

20           MR. McDONOUGH:  No, because we had heard it was

21  installed or they were working on installing it in one.  They had

22  a prototype as we understood it --

23           THE COURT:  Got it.

24           MR. McDONOUGH:  -- that they were trying to get

25  certified by the FAA, and so that's why we started seeking those

1    documents.  So I can send you those after the hearing if you

2    would like to see that we clearly were --

3              THE COURT:  What was the response from the other side?

4              MR. McDONOUGH:  Was that they have not sold, or somewhat

5    very carefully worded language looking back at it, that they

6    didn't have a product for 757 when in fact it was in development,

7    they had it in a plane and they had even been talking to the FAA

8    about it.

9              THE COURT:  So what you're saying is you had been

10   requesting this for some time.

11             MR. McDONOUGH:  Yeah, for a couple -- almost since the

12   beginning of the case, since the second discovery hearing is when

13   we first started -- we heard about it and started bringing it up,

14   like four discovery hearings, this might be the 5th.  Yeah.  And

15   again, I can submit those.  And Mr. Worley may not have looked in

16   his e-mail or in those charts or maybe it wasn't on those

17   e-mails, I'm not sure, but the Court was.

18             With respect to all the -- you know, the Defendants have

19   refused to produce all of the back and forth with the FAA on all

20   the other products.  So, you know, I heard him say well, this is

21   a lot of information, there's a lot of back and forth with the

22   FAA.  They've never produced that to us for any of the other

23   products.  The only thing they've produced is the package that

24   we're asking for now.  So I'm not looking for broad-ranging

25   discovery, e-mails or anything like that like with the FAA, I

1    don't care.  I just want to know what was submitted to the FAA

2    because that is ultimately how the product works.  And that is

3    what the FAA approves.  I suppose they could be doing it

4    differently now, but it would be in violation of the law, so I

5    seriously doubt they are.  So I suspect that --

6              THE COURT:  But what if they changed the design or the

7    process in a way which is materially different?  It's possible.

8    They're in the middle of a lawsuit, right?

9              MR. McDONOUGH:  We have asked for updated -- from time

10   to time there are revisions to these documents they have to

11   submit to the FAA, and it becomes -- I forgot the exact term for

12   it, but it's a modification.  You have to submit documents and

13   get a modification.  My understanding is that we have the latest

14   modifications because we've tried.  Like at one point in time we

15   were trying to get all the modifications so we could see what

16   were they doing at first, did they change it.  And they refused

17   to do that.  They only would give us the last one, the one that

18   they said -- and they said it didn't substantially change.  So

19   ultimately what we're looking for, honestly, is the last one, you

20   know, the one that is current, the one they're using to install

21   757 AerSafe kits.

22              I heard a lot about the infringement contentions.  The

23   proper remedy would have been to move to compel supplemental --

24   you know, supplemental infringement contentions.  If they thought

25   it was deficient or defective, they should have moved for it just

1    like you would for an interrogatory, right?  So I don't

2    understand.  And it was pled, they e-mailed us saying that they

3    wanted us to update them at some point early on in the case.  In

4    fact, they mentioned it in their motion to stay but they never

5    moved for it.

6            THE COURT:  Don't you have -- and again, this is not

7    necessarily the issue today, but don't you have an independent

8    duty to supplement your contention?

9            MR. MCDONOUGH:  Yeah, that's why we want to supplement

10   -- so part of this is we plan to supplement our contentions, but

11   we want to get discovery so that our expert can use those.  We

12   think we can update our contentions with public documents enough

13   to satisfy ourselves that there is infringement.  However, that's

14   not going to be enough for the Court.  They're going to need to

15   see element-by-element evidence from these FAA documents, I

16   assume, showing where each feature of the claimed inventions are

17   in the product and that's for the expert, right?  So infringement

18   contentions are theories.

19           THE COURT:  Don't you need to independently of that --

20   the 757 issue, forget that.  Don't you need to independently

21   supplement -- unless you're going to stand on the original

22   contentions, right?  That's possible.  But if you're going to

23   have different ones, didn't you need to supplement by tomorrow?

24           MR. MCDONOUGH:  If our infringement theories have

25   changed.

1          THE COURT:  Right.

2          MR. MCDONOUGH:  My understanding is our contentions,

3    infringement contentions -- first of all they're often at the

4    very beginning of the case before any discovery is done.  Often

5    like in Texas and California, it's like two weeks after the

6    Defendant answers.  So it's based off all public information,

7    right?  A lot of times the real technical meat is in confidential

8    documents held by the Defendant.  And, you know, oftentimes

9    there's a lot of case law, and I didn't look it up because I

10   didn't know this was going to be an issue here, but there's case

11   law here saying that infringement contentions are your theories

12   of infringement.  If your theory of infringement changes, then

13   yeah, you would have to update those.

14          But even if you use drawings or whatever you want

15   showing your theory of how this thing infringes, that is enough.

16   Then they know, okay, here's what they're saying and we can do

17   discovery on that.  Right?  In the end there's going to be actual

18   documents and things that an expert will say here's the theory

19   that was presented and here is where this element is according to

20   this theory.

21          So I believe there's a significant amount of case law.

22   Again, I didn't brief this or address this.

23          THE COURT:  In other words, putting outside the patent

24   world, right?  You have interrogatories that you answered about

25   what your contentions were as to how the patents are infringed

1    and in the normal course of Rule 26, you have to supplement those

2    in a timely way, at the very least by the end of discovery,

3    right?  And discovery closes on February 10th, which is tomorrow.

4          So in the ordinary course wouldn't you, at minimum, be

5    filing or -- not filing, serving if you're going to amend them,

6    amended disclosures tomorrow?

7          MR. MCDONOUGH:  If we're going to amend our theories of

8    infringement, yeah.  Yeah.  We would have to.

9          THE COURT:  What I hear you saying is you don't really

10   need to amend them because you're standing on your original

11   theory.  Is that the idea?

12         MR. MCDONOUGH:  Yeah.  I mean, I suppose we could file

13   something changed in our contentions tomorrow, but as I stand

14   here right now I know the case pretty well, I don't think we plan

15   to do that.  I think we'll stand on our original theories that we

16   think hold true.  Now, it's not all the evidence that we have to

17   support those theories, but that's a different question.

18         THE COURT:  All right.  Well, what depositions are you

19   taking now, by the way?

20         MR. MCDONOUGH:  What's that?

21         THE COURT:  What depositions are you now taking?

22         MR. MCDONOUGH:  So we have -- there's four.  You want

23   the individual names?

24         THE COURT:  Or categories, yeah.

25         MR. MCDONOUGH:  Yeah.  Well, there's like essentially

1   the CEO.  It's not a huge company like Intel or something, right?

2   So the CEO has personal knowledge.  The chief salesperson, I

3   think it was for AerSale who my client dealt with directly when

4   -- so the reason -- the whole way this came about is my client

5   came up with an idea to take something that had been used in like

6   Vietnam and old, essentially, military applications this foam and

7   put it in commercial airliners to make them safer.  Because TWA,

8   you know, there's a couple big crashes in the 80s and 90s, and in

9   the last one he had a friend on there that passed away and he

10  started researching this.  He was in the airline industry and he

11  thought okay, this is a great solution.  Because the other

12  solution, which was offered by Boeing and Airbus, which is a very

13  -- it's a nitrogen inerting system which is really expensive,

14  really high maintenance.  And he was like look at this, they were

15  using foam in the military, I wonder if I could do that in a

16  commercial aircraft.  First of all, can I get it approved by the

17  FAA, which it turned out to be years, years in the making.  And

18  he was told that the FAA would never approve it, you could never

19  get something like this approved as safe in a commercial

20  airliner, blah, blah, blah.  He proved everybody wrong.

21         Along the way he needed an aircraft in order to install

22  the system in to show the FAA as a prototype.  So AerSale, who

23  was a customer of his from some of his other products that he was

24  selling at the time, much smaller products, offered to let him

25  use one of their aircrafts to install the system, a B 737.  So he

1    used that, their system -- sorry, their aircraft, installed the

2    system, the tank, got FAA approval.  Took, I want to say, a year

3    or longer.  And then so there was an individual at AerSale that

4    he was working with during that time.  And then basically they

5    didn't want to --

6            THE COURT:  So why didn't you depose these people

7    before?

8            MR. McDONOUGH:  We were, quite frankly, waiting to get

9    discovery.  So a lot of the reason discovery has been going so

10   long here is there was a period of time where we were waiting on

11   claim construction.  It took probably a year.  We had finished

12   claim construction, the special master took a while to write a

13   report, and then the Judge had to look at that and decide whether

14   he was going to stick with it.  We have since moved for

15   reconsideration of one of the terms which you heard, the 998

16   patent term that was deemed indefinite.  We moved for

17   reconsideration, and that motion is pending.  So we're not just

18   pushing this theory knowing that this is dead, right?  We think

19   the Court may have made a mistake, and we pointed out how we

20   thought the Court made a mistake in those documents, and the

21   motion for reconsideration, we think, is very strong.

22           THE COURT:  Well, why wouldn't you be deposing people

23   while that's pending?  I don't get that.

24           MR. McDONOUGH:  Why wouldn't we be --

25           THE COURT:  Why wouldn't you have taken it before?

1    MR. McDONOUGH:  We were waiting for final claim

2    construction so that we would know exactly, like, what these

3    terms meant in the Court's view before we ask people questions

4    about, you know, what does a third block with the arc unit cutout

5    for an upper stiffener mean.  You know.  It's silly, but like

6    these patents with words, they're ultimately defined and a lot of

7    time what a plaintiff believes a word means and what a defendant

8    thinks a word means, very drastic.  So the Court will come to an

9    agreement on that, that way we're all working from the same

10   workbook and asking questions that target the ultimate

11   constructions.

12        THE COURT:  And when was the claim construction

13   complete?

14        MR. McDONOUGH:  Claim construction, let's see.  We got

15   our final order maybe June?  2022?

16        MR. WORLEY:  That sounds --

17        MR. McDONOUGH:  July.

18        MR. WORLEY:  I don't recall.

19        MR. McDONOUGH:  Somewhere in the summer.  Last summer.

20   And then we did some additional -- served some additional

21   discovery, and then set up started doing depositions.

22        THE COURT:  Okay.

23        MR. McDONOUGH:  I agree we could have learned -- I do

24   agree we should take deposition early.

25        THE COURT:  Yeah.  All right.  Well, the only thing I

1    can do at this point is -- your expert report is due March 10th,

2    right?

3                MR. MCDONOUGH:  Correct.  We have the burden on the

4    infringement issues, so we would go first and they would be

5    responding to that.  Well, they may.  I suppose they may have an

6    opening on report of noninfringement.  I'm not sure.

7                THE COURT:  Okay.  Well, so the only thing I'm

8    compelling on the request for production dealing with the 757 is

9    the FAA submission packet.  So I'm not talking about all e-mails

10   related to it, I'm talking about the application packet, the

11   design specs that were submitted and then the documents back from

12   the FAA.  So it's a discrete file, and that's all I have time to

13   do for now.  That information obviously your expert can review

14   and decide if, by March 10th, he's going to be able to render an

15   opinion on whether or not that's covered.  If he doesn't have an

16   opinion by then, well then don't include it.  And then if you

17   have a new lawsuit, you can make later with additional time.

18   You'll decide, right?

19                So clearly the Defendant's entitled to know by March

20   10th what the expert believes with respect to -- based upon that

21   data, and to the extent that there's any amendment of any

22   contention interrogatory, clearly it has to be at the very least

23   by then because then they need to be able to respond and then

24   there's additional time in the discovery period to do that.

25   Okay?

1          So I'm granting the motion only in that limited part.

2          MR. McDONOUGH:  Thank you, Your Honor.

3          THE COURT:  A week for the production?  What day is it

4    today?  The 9th.

5          MR. WORLEY:  The 9th, Your Honor.

6          THE COURT:  So that would be --

7          MR. WORLEY:  If I can clarify, you're not also granting

8    an extension of discovery to amend infringement complaints as to

9    any other product.  Those are still due by tomorrow if at all,

10   correct?

11         THE COURT:  Yeah, I'm not -- you haven't requested it

12   and he's going to stand on it and so yeah, basically I'm not

13   going into any of that, right?  The next disclosure you're going

14   to get from him is apparently March 10th.

15         And so then is February 17th sufficient time?

16         MR. WORLEY:  It should be.  I'll certainly let Mr.

17   McDonough know if there are any issues, but I don't foresee any

18   issues to have that by February 17th.

19         THE COURT:  Great, because that gives the expert

20   basically three weeks to look at them and analyze them and figure

21   out if he can render an opinion or not.  Obviously whatever

22   report you have due on the 10th does not include that because you

23   don't have anything to work off of.  So that I can grant your

24   relief.  So to the extent that you would be ordinarily preparing

25   something on that, you don't need to by the 10th.

1          MR. WORLEY:  Well, one of the other issues, Your Honor,

2     is to the extent we have our answers to interrogatories

3     discussing, you know, noninfringement positions, we have not made

4     any analysis of the 757.  And I don't know how those would be

5     supplemented by tomorrow.

6          THE COURT:  I'm not compelling you to.

7          MR. WORLEY:  Okay.

8          THE COURT:  I'm not compelling you to supplement them by

9     tomorrow.

10          MR. WORLEY:  Okay.  So I understand it, this discovery

11     order is basically giving their expert a peek and then nothing

12     else is changing in this case?

13          THE COURT:  Correct.  Now, if he comes back and if he's

14     able to render an opinion in good faith that oh, the 757 should

15     be covered too by our infringement claims, that's going to then

16     raise the next step, right?  And in the next step, you're going

17     to come in and say you need to put a stop to this, and at the

18     very least I'm entitled to A, B, C and D, right?  He may come

19     back and respond in opposition or agree, whatever.

20          In other words, the next step will be the March 10th

21     disclosures.  Because obviously the whole thing is moot if the

22     expert doesn't include the 757 in his report because then in that

23     case no harm-no foul.  Does that make sense?

24          So I like the way you put it, it is kind of a peek into

25     it.  And just for the record, the reason is that I don't have

1   enough information yet to know whether this is simply just an

2   additional product or a material change in the case.  Your

3   representation to me is this is a material change in the case

4   because the whole -- this is not just a copy of the 67 that's

5   just transplanted into the 57, there are material changes in the

6   process.  And even the way you described this is basically a

7   method patent, the method is completely different.

8           MR. WORLEY:  Certainly the shape of the blocks that are

9   involved in the method, absolutely.

10          THE COURT:  If that's the case, you might have a good

11  argument.  I just don't have enough information and he, in

12  fairness, can't make an argument yet.  He only has very surface

13  knowledge, right?  And so that's why I'm granting him that

14  request since it has been requested.  In fairness, it has been

15  requested for some time.  The request for production was issued

16  back in October so, you know, it's hard for me to say hey,

17  everything is over.  He's been requesting that information for

18  some time, so I'm giving him relief.  I may have done a lot more

19  had I had this in October, but it is what it is.  So at the very

20  least I'm giving his expert an opportunity to analyze it.

21          Because what if he comes back and says this is even more

22  infringing than the other ones then?  Hypothetically.  Well, he

23  may want to reopen discovery because now his whole case may be

24  now about the 757.

25          MR. WORLEY:  That's the slippery slope I'm worried

1    about.

2              THE COURT:  I understand.

3              MR. WORLEY:  We have no idea what type of experts are

4    going to be --

5              THE COURT:  I get it.  We'll take it a step at a time.

6              So that's the relief I'm going to grant the Plaintiff at

7    this point, and we'll see where we are after March 10th.  I have

8    a feeling I'll be dealing with you on the expert discovery part

9    because expert discovery does not close until April 28th.

10             MR. WORLEY:  I've heard Miami is nice at this time of

11   year, so I look forward to coming back, Your Honor.

12             THE COURT:  Okay.  All right.  We'll adjourn for now.

13   Thank you very much.

14             So yeah, so February 17th for the due date on that

15   production.

16             MR. WORLEY:  Understood, Your Honor.

17             THE COURT:  Thank you.

18             MR. WORLEY:  Thank you.

19             (PROCEEDINGS CONCLUDED)

20                         *  *  *  *  *
                    C E R T I F I C A T E
21   I certify that the foregoing is a correct transcript from the
     digital audio recording of proceedings in the above-entitled
22   matter.

23   6/6/2023                /s/ Dawn M. Savino, R.P.R., C.R.R.
     Date                    DAWN M. SAVINO, R.P.R., C.R.R.

24

25

PROCEEDINGS RECORDED BY COURTROOM DIGITAL AUDIO RECORDER
TRANSCRIPT PRODUCED BY MECHANICAL STENOGRAPHY
AND COMPUTER-AIDED TRANSCRIPTION