## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 20-25144-Civ-GAYLES/TORRES

JETAIRE AEROSPACE, LLC,

     *Plaintiff,*

v.

AERSALE, INC.,

     *Defendant.*

_____/

AERSALE, INC.,

     *Counter-Plaintiff,*

v.

JETAIRE AEROSPACE, LLC,
JETAIRE FLIGHT SYSTEMS, LLC, and
MICHAEL WILLIAMS,

     *Counter-Defendants.*

_____/

## REPORT AND RECOMMENDATION ON DEFENDANT/COUNTER-PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This cause comes before the Court on Defendant / Counter-Plaintiff, AerSale, Inc.'s ("AerSale"), motion for summary judgment [D.E. 196] against Plaintiff / Counter-Defendants, Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, and Michael Williams ("Mr. Williams") (collectively, "Jetaire"). Jetaire responded to the motion on August 4, 2023 [D.E. 230], to which AerSale replied on August 11, 2023. [D.E. 247]. The Court also held a hearing on the motion. [D.E. 310]. The motion,

1

therefore, is ripe for disposition.[1] After careful consideration of the briefing materials, the evidence of record, the relevant authorities, and for the reasons discussed below, we hereby RECOMMEND that Defendant's motion be **GRANTED**.

## I.   BACKGROUND

This case involves a patent infringement dispute. Specifically, Jetaire alleges that AerSale infringed on three of its patents for fuel tank ignition mitigation technology: U.S. Patent No. 9,849,998 ("'998 Patent"), U.S. Patent No. 10,633,109 ("'109 Patent"), and U.S. Patent No. 10,800,541 ("'541 Patent") (collectively, the "Asserted Patents"). The underlying technology (i.e., Jetaire's "Invicta" product) provides a method and system of accomplishing ignition mitigation using reticulated polyurethane safety foam in coordinated shapes to fill the fuel tanks in compliance with Federal Aviation Administration ("FAA") regulations. [D.E. 1 at ¶ 17].

In 2013, Jetaire began documented conversations with Xtra Airways and AerSale for the purchase of the Invicta product. While Jetaire disputes that it made a commercial offer for sale of the product, it is undisputed that AerSale purchased the Invicta product from Jetaire, installed it in an aircraft, and, finding it to be an ineffective product, uninstalled it from the aircraft. Shortly after, AerSale began developing its own ignition mitigation technology to compete with Jetaire's Invicta product.

Consequently, Jetaire filed this action against AerSale asserting three counts

---

[1] On December 8, 2023, the Honorable Darrin P. Gayles referred this matter to the Undersigned Magistrate Judge for a report and recommendation. [D.E. 279].

of patent infringement: I: Infringement of the '998 Patent; II; Infringement of the '109 Patent; and III: Infringement of the '541 Patent. [D.E. 1]. In response, AerSale has filed twelve counterclaims (now its Third Amended Counterclaim), six of which are material to this motion:

> I: Declaratory Judgment of Non-Infringement of the '998 Patent;
>
> II: Declaratory Judgment of Non-Infringement of the '109 Patent;
>
> III: Declaratory Judgment of Non-Infringement of the '541 Patent;
>
> IV: Declaratory Judgment of Invalidity of the '998 Patent;
>
> V: Declaratory Judgment of Invalidity of the '109 Patent; and
>
> VI: Declaratory Judgment of Invalidity of the '541 Patent.

[D.E. 159]. AerSale now seeks summary judgment in favor of each of those six counterclaims.

## II.    APPLICABLE PRINCIPLES AND LAW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the

motion. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In making this determination, the Court must decide which issues are material. A material fact is one that might affect the outcome of the case. *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). "Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

### III.   ANALYSIS

In its motion, AerSale raises three primary arguments as to liability. First, it argues that, for several reasons, the Asserted Patents are invalid. It further argues that for all of AerSale's product installations that occurred outside of the United States, AerSale did not infringe upon Jetaire's patents. Lastly, AerSale argues that, for several reasons, it did not infringe upon a particular one of the Asserted Patents (the '541 patent).

Separately, AerSale argues that even if AerSale is liable for infringement, Jetaire cannot prove that it is entitled to damages for lost profits.

For its invalidity arguments, AerSale asserts three separate bases. It argues primarily that the "on-sale bar" renders all of the Asserted Patents invalid. As for Patent '998, AerSale argues that the patent is indefinite and therefore is invalid. As for Patent '109 and Patent '541, AerSale argues that, for separate reasons than Patent '998, the two patents are indefinite and therefore invalid.

We will first address the on-sale bar argument because it seeks to invalidate all the Asserted Patents on a common basis. Accordingly, if this argument succeeds, the remainder of AerSale's arguments will effectively be moot.

### A. *On-Sale Bar*

The on-sale bar is a mechanism that renders a patent invalid when certain requirements are satisfied. *See Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 249 F.3d 1307, 1313 (Fed. Cir. 2001) (affirming the invalidity of a patent where the on-sale bar's requirements were satisfied); *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1375 (Fed. Cir. 2017), *aff'd*, 139 S. Ct. 628, 202 L. Ed. 2d 551 (2019) (same); *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1367 (Fed. Cir. 2000) (same). In *Pfaff v. Wells Electronics, Inc.*, the Supreme Court delineated "that the on-sale bar applies when two conditions are satisfied before the critical date."[2] 525 U.S. 55, 67 (1998). The first is that "the product must be the subject of a commercial offer for sale." *Id*. The second is that "the invention must be ready for patenting." *Id*. These

---

[2] "The date exactly one year prior to the date of application for the patent is known as the critical date." *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1327 (Fed. Cir. 2001).

barriers "can only be overcome by clear and convincing evidence." *Dana Corp. v. Am. Axle & Mfg., Inc.*, 279 F.3d 1372, 1375 (Fed. Cir. 2002).

On balance, the on-sale bar ensures that parties may not enjoy the benefit of monopoly that the patent process provides if they have availed their patent-ready product for commercial sale a year or more before the patent's effective filing date. *See Merck & Cie v. Watson Laboratories, Inc.*, 822 F.3d 1347, 1350–51 (Fed. Cir. 2016) ("[A]n inventor acquires an undue advantage over the public by delaying to take out a patent, inasmuch as he thereby preserves the monopoly to himself for a longer period than is allowed by the policy of the law.") (quoting *City of Elizabeth v. Am. Nicholson Pavement Co.*, 97 U.S. 126, 137, 24 L.Ed. 1000 (1877)). If both requirements are met, then essentially, the patent falls victim to "section 102 of the Patent Act [which] serves as a limiting provision, both excluding ideas that are in the public domain from patent protection and confining the duration of the monopoly to the statutory term." *Pfaff*, 525 U.S. at 64 (citing *Frantz Mfg. Co. v. Penix Mfg. Co.*, 457 F.2d 314, 320 (7th Cir. 1972)).

Accordingly, if on or before the critical date of September 11, 2014,[3] (1) Jetaire offered its Invicta product for commercial sale, and (2) Jetaire's Invicta product was ready for patenting, the Asserted Patents are invalid and summary judgment is proper.

---

[3] It is undisputed that the "earliest effective filing date" of the Asserted Patents is September 11, 2015. *See* [D.E. 315 at ¶ 1]; [D.E. 239 at ¶ 1]. Accordingly, the critical date is September 11, 2014 ("the date exactly one year prior to the date of application for the patent is known as the critical date."). *Scaltech, Inc.*, 269 F.3d at 1327.

### 1. *Commercial Offer For Sale*

The first step of the on-sale bar analysis is to determine whether the Asserted Patents were subject to a "commercial offer for sale" by Jetaire on or before September 11, 2014. *See id.* at 67. This date is sufficient to encompass the effective filing date for all three of the Asserted Patents. That is because the record evidence demonstrates that the Invicta product encompasses the Asserted Patents. For example, Mr. Williams (Jetaire's designated representative) testified that the "original design" of the Invicta product, "as covered by the STC, [is] protected by the patents-in-suit." [D.E. 253-1 at 59:18–23]. It is also evidenced by Jetaire marking the boxes of its Invicta product with all three of the Asserted Patents. [D.E. 253-14].

"Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." *Scaltech, Inc.*, 269 F.3d at 1328 (quoting *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048, 59 USPQ2d 1121, 1126 (Fed. Cir. 2001)). Importantly, "[a]n offer for sale does not have to be accepted to implicate the on sale bar." *Id.* In determining whether an offer for sale was made, "we look to the specific facts and circumstances presented in this case, 'apply[ing] traditional contract law principles' along the way." *Junker v. Med. Components, Inc.*, 25 F.4th 1027, 1032 (Fed. Cir. 1998), *cert. denied*, 143 S. Ct. 205, 214 L. Ed. 2d 79 (2022) (quoting *Merck & Cie*, 822 F.3d at 1351). "In determining whether an offer [has been] made[,] relevant factors include the terms of any previous inquiry, the completeness of the terms of the suggested bargain, and the number of

persons to whom a communication is addressed." *Id*. (quoting Restatement (Second) of Contracts § 26 cmt. c (1981)). Informed by the Uniform Commercial Code (which is not "determinative individually"), "[a] sale occurs when there is a 'contract between parties to give and to pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.'" *Helsinn Healthcare S.A.*, 855 F.3d at 1364 (quoting *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1361 (Fed. Cir. 2010)).

AerSale argues that four commercial offers for sale were made before the critical date: a December 8, 2013 offer to Xtra Airways; a April 11, 2014 revised offer to Xtra Airways; a July 14, 2014 offer to AerSale; and an August 21, 2014 offer to AerSale.

We will start with December 8, 2013. On that date, Xtra Airways sent to Jetaire an email hoping to "put a deal together." [D.E. 315-38 at 3]. Then, on the same day, Jetaire responded to Xtra Airways with a signed letter. That letter stated that "[w]e understand that you are ready to proceed with the installation of Invicta," and provided that "[o]ur offer is as follows," before providing the price, payment terms, and services. [*Id*. at 24]. The signed letter also provided that "[o]ur standard agreement is attached for your execution." [*Id*.]. That "standard agreement" proposed pricing, detailed payment terms, identified services, and included myriad other contract terms within its nineteen pages.

A few months later, on April 11, 2014, Jetaire sent to Xtra Airways another signed letter. This letter identified "a revision to Jetaire's original offer," followed by,

once again, a statement that "our offer is as follows" before providing price, payment terms, services, and certain conditions. [D.E. 315-39 at 3].

Then, on July 14, 2014, Jetaire sent to AerSale a "propos[al]" of its "services" to provide the Invicta technology. [D.E. 315-40]. It included detailed pricing in this proposal: $190,000.00 per unit if AerSale purchased 1–5 units, and discounted pricing of $180,000.00 per unit if AerSale purchased 6–10 units. [*Id.*]. The "propos[al]" also noted that pricing was "exclusive to AerSale … in appreciation of [Jetaire's and AerSale's] long term relationship" and provided the timeframe in which delivery would be made. [*Id.*]. It anticipated that, sometime during the week of July 14, 2014, the FAA would issue the required Supplemental Type Certificate ("STC"). [*Id.*] The letter then thanked AerSale for its "consideration of Jetaire's proposal." [*Id.*].

Lastly, on August 21, 2024, Jetaire emailed AerSale and informed AerSale that it was "taking orders for the [Invicta] System now!" and attached its STC (which was received on July 28, 2014). [D.E. 315–23 at 2–5]. The email then stated that Jetaire would "call in a few days to discuss potential business." [*Id.*]. The record, as provided to the Court, does not indicate whether that phone call ever took place, or whether price terms, delivery terms, or other terms of sale were discussed.

Here, drawing all reasonable inferences in favor of Jetaire, no reasonable jury could conclude that Jetaire did *not* make an offer to Xtra Airways on December 9 and April 11, and to AerSale on July 14. Conversely, based on the absence of definite sales terms in the August 21 communications, a reasonable juror could conclude that no commercial offer for sale was made on that date.

Beginning with Xtra Airways, unmistakably on December 8, 2013, Jetaire placed a commercial offer on the table. By way of example, in *Merck & Cie*, the Federal Circuit held that a commercial offer was made where the offeror sent a fax that included the service to be provided as well as "essential price, delivery, and payment terms." 822 F.3d at 1351. The court noted in further support that the "fax was not an unsolicited price quote sent to numerous potential customers," but was directed to a specific customer. *Id.* (holding that the asserted patent was invalid as a matter of law under the on-sale bar).

Here, quite similarly, the unexecuted contract accompanying AerSale's December 8 email included "essential price, delivery, and payment terms." *Id.* As for price, the unexecuted contract detailed the "per unit" price of $225,000.00, the initial payment due at the execution of the agreement ($112,500.00), and the remaining balance that would be due at delivery ($112,500.00). [D.E. 315-38 at 22]. As for payment details, it required that payment be made by wire transfer [i*d.* at 8], provided wiring details [*id.* at 11], identified the deposit amount [*id.* at 22], explained the invoice system, and explained the consequences for withholding delivery and/or default. [*Id.*]. As for delivery, Jetaire's letter specified that delivery would take place on April 15, 2014, and any remaining balance would be "due at the time of delivery."

Plainly, this situation is not one in which "[t]he letter to [Xtra Airways] lacked any mention of quantities, time of delivery, place of delivery, or product specifications beyond the general statement that the potential product would be [the Invicta product]" and included a "licensing fee" as opposed to "price terms." *Elan Corp., PLC*

10

*v. Andrx Pharms., Inc.*, 366 F.3d 1336, 1341 (Fed. Cir. 2004). Rather, the letter and accompanying contract are more akin to *Merck & Cie* as well as *Helsinn Healthcare S.A.*, in which the Federal Circuit held that a commercial offer was made where, in addition to identifying the precise services to be provided, "[t]he agreement … included other specific terms, such as price, method of payment, and method of delivery". 855 F.3d at 1364–65.

Moreover, Jetaire's offer letter was directly and uniquely addressed to Xtra Airways; importantly, it "was not an unsolicited price quote sent to numerous potential customers." *Merk & Cie*, 822 F.3d at 1351 (citing Restatement (Second) of Contracts § 26, cmt. c (1981) (explaining that a "relevant factor[ ]" in determining whether an offer has been made is "the number of persons to whom a communication is addressed"); *see also Junker*, 25 F.4th at 1033 ("As stated on the face of the letter, Xentek was directly responding to a 'request for quotation' from Boston Scientific, and the letter was addressed to Boston Scientific alone. This signals that the letter was not an unsolicited price quotation or invitation to negotiate, but rather a specific offer to Boston Scientific to take further action.").

Plainly, then, on December 8, 2013, Jetaire offered to Xtra Airways a commercial sale of its Invicta product (i.e., a product which featured the Asserted Patents). Jetaire's "detailed [letter]—providing essential price, delivery, and payment terms—contained all the required elements to qualify as a commercial offer for sale." *Merck & Cie*, 822 F.3d at 1351. Accordingly, drawing all reasonable inferences in favor of Jetaire, a commercial offer for sale was made and no reasonable juror could

conclude otherwise. It is not dispositive whether Xtra Airways accepted the offer and/or the sale was ever consummated; all that is required under *Pfaff* is a commercial offer for sale. *See Helsinn Healthcare S.A.*, 855 F.3d at 1370 (noting that "we have never required that a sale be consummated or an offer accepted for the invention to be in the public domain and the on-sale bar to apply, nor have we distinguished sales from mere offers for sale") (citing *Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 726 F.3d 1370, 1374, 1377 (Fed. Cir. 2013)) (other internal citations omitted).

And to remove all doubt, Jetaire sent to Xtra Airways a follow-up letter on April 11, 2014. This letter included "a revision *to Jetaire's original offer*", and provided that it was a "substantial incentive over the *existing great offer on the table*." [D.E. 315-39 at 3] (emphasis added). It then stated "[o]ur offer is as follows," while providing a revision to prices and services, and requiring certain conditions. [*Id.*]

Clearly, on April 11, 2014, Jetaire conceded that it made an offer on December 8, 2013 by referring to it both as an "original offer" and an "existing great offer on the table," and then revised that offer (i.e., noted that "our offer is as follows" with revised terms). Even drawing all reasonable inferences in favor of Jetaire, it is difficult for Jetaire to contend, and impossible for a reasonable juror to conclude, that Jetaire did not make a commercial offer to Xtra Airways on December 9 and revise that offer (i.e., make a new offer) on April 11, 2014. *See Junker*, 25 F.4th at 1033 ("The completeness of the relevant commercial sale terms [i.e., "price," "delivery conditions," and a "payment term"] in the letter itself signals that this letter was not merely an

invitation to further negotiate, but rather multiple offers for sale, any one or more of which Boston Scientific could have simply accepted to bind the parties in a contract.").

The record also demonstrates, even drawing all justifiable inferences in favor of Jetaire, that on July 14, 2014, Jetaire yet again offered its Invicta product for commercial sale—this time to AerSale. Like the Xtra Airways offers, Jetaire's self-titled "proposal" to AerSale included all the material elements of a commercial offer. Jetaire's letter thanked AerSale "for the opportunity to propose our services" of the "Invicta Ignition Mitigation Technology." [D.E. 315-28 at 3]. The letter further noted that Jetaire "anticipate[d] that the FAA [would] issue the STC" some time that week. [*Id*.]. It then provided detailed pricing: for 1–5 units, $190,000.00 per unit and $10,000.00 installation; and for 6–10 units, discounted pricing of $180,000.00 per unit $10,000.00 installation. [*Id*. at 4]. The letter also specified delivery details—specifically, that "the delivery lead time … [would] be one month" with "priority handling," and if six or more units were purchased, "they [could] be delivered on [AerSale's] schedule over a two year period." [*Id*.]. Lastly, the letter thanked AerSale "for [its] consideration of Jetaire's proposal," followed by Mr. Williams signature. [*Id*.].

Akin to the Xtra Airways offer, and consistent with applicable Federal Circuit caselaw, Jetaire's July 14 letter to AerSale indisputably includes price points, delivery information, services to be provided, identified itself as a "proposal," and placed into AerSale's hands the power of acceptance. Clearly and unequivocally, on July 14, Jetaire offered its Invicta product to AerSale for commercial sale. *See Merck*

*& Cie*, 822 F.3d at 1351 (holding that "Martin's detailed fax—providing essential price, delivery, and payment terms—contained all the required elements to qualify as a commercial offer for sale" and explaining that a "relevant factor[ ]" in determining whether an offer has been made is "the number of persons to whom a communication is addressed"); *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1369 (Fed. Cir. 2007) ("The June 7 letter explicitly sets forth an amount of oil to be delivered to P & G, at a specified unit price, and under a standard contract designation, FOB … which allocates the risks and responsibilities of a buyer and a seller. As recognized by the district court, that is powerful evidence of a sales transaction."); *Junker*, 25 F.4th at 1033 ("The completeness of the relevant commercial sale terms [i.e., "price," "delivery conditions," and a "payment term"] in the letter itself signals that this letter was not merely an invitation to further negotiate, but rather multiple offers for sale, any one or more of which Boston Scientific could have simply accepted to bind the parties in a contract."); *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1282 (Fed. Cir. 2005) (affirming a finding that a commercial offer for sale was made where the "agreement created the necessary contractual obligations on the parties to constitute a commercial offer for sale," because the offered product for purchase "clearly [evidenced] commercial purposes"); *Scaltech, Inc.*, 269 F.3d at 1328 ("Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b).") (quoting *Group One, Ltd.*, 254 F.3d at 1048); *The Medicines Co. v.*

14

*Hospira, Inc.*, 881 F.3d 1347, 1351 (Fed. Cir. 2018) (finding that the terms of the agreement "ma[d]e clear" that there was an offer for sale where the "relevant terms include[d] a statement that [the offeree] 'now desire[d] to sell the product" … the price of the product … the purchase schedule … and the passage of title").

In defense, Jetaire argues that there could be no commercial offer for sale because the intended use of its Invicta products was merely experimental. "To determine whether a use is 'experimental,' a question of law, the totality of the circumstances must be considered, including various objective indicia of experimentation surrounding the use, such as the number of prototypes and duration of testing, whether records or progress reports were made concerning the testing, the existence of a secrecy agreement between the patentee and the party performing the testing, whether the patentee received compensation for the use of the invention, and the extent of control the inventor maintained over the testing." *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1120 (Fed. Cir. 1996) (citing *TP Lab'ys, Inc. v. Pro. Positioners, Inc.*, 724 F.2d 965, 971–72 (Fed. Cir. 1984)). Specifically, "[t]he last factor of control is critically important, because, if the inventor has no control over the alleged experiments, he is not experimenting." *Id.*; *see also Zacharin v. United States*, 43 Fed. Cl. 185, 192 (1999), *aff'd*, 213 F.3d 1366 (Fed. Cir. 2000) ("The final factor is crucial because an inventor must have controlled the alleged experiments in order for a court to conclude that he was experimenting.")

The Federal Circuit has refined what sorts of factors undermine an argument that an offer was made for primarily experimental purposes. *See Sunoco Partners*

*Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1169 (Fed. Cir. 2022). In *Sunoco*, for example, the relevant agreement did not make any "reference to any experimental purpose." *Id.* Additionally, as consideration, it contemplated the "purchase" of the relevant product and specified that the offeree "agree[d] to purchase a minimum of 500,000 barrels of Butane." *Id.* It also stated that the offeror already "'developed' the relevant technology and equipment, that [the offeree] wanted to purchase it, and that [the offeror] was willing to sell it, install it, and supply butane for it." *Id.* Moreover, there was "'no suggestion' that the agreement 'did not involve transfer of title,'" and in fact, "'expressly contemplate[d] it.'" *Id.* (quoting *Helsinn Healthcare S.A.*, 855 F.3d at 1364). Accordingly, the relevant agreement "bear[ed] 'all the hallmarks of a commercial contract for sale.'" *Id.* (quoting *Helsinn Healthcare S.A.*, 855 F.3d at 1364); *cf. EZ Dock v. Schafer Sys., Inc.*, 276 F.3d 1347, 1353 (Fed. Cir. 2002) (recognizing a genuine dispute of fact as to whether there was experimental use where the inventors "monitor[ed]" the experimentation, "visited the dock that [was] purchased on several occasions," "made repairs for free," and therefore "show[ed] that the inventors were still working to detect and correct flaws in their invention.").

Here, the details of the offers made by Jetaire to Xtra Airways and AerSale do not include indicia of experimental use. The language of the offered agreements between the parties make no mention of experimental use, prototypes, or anything of the like. The agreement offered to Xtra Airways, for example, states only that "Buyer … desires to purchase from Seller engineering services and related items to comply

16

with SFAR 88 for the B737-400 Center Wing Tank as more fully identified in Appendix A ….” [315-38 at 5]. Nowhere in Appendix A does the agreement mention experimental or prototypical use. [*Id*. at 13]. Indeed, as in *Sunoco*, 32 F.4th at 1169, the offered contact does not make “any reference to any experimental purpose,” and in fact “expressly contemplates” transfer of title. In pertinent part, Appendix A of the Xtra Airways offer states that “nothing contained in the foregoing shall prevent BUYER from transferring its rights to the STC as may be required or necessary in connection with [several situations].” [D.E. 315-38 at 13].

And in addition to making no mention of experimental or prototypical use, each of the offered agreements contained “all the hallmarks of a commercial contract for sale” by including price points, payment terms, delivery details, and other contract terms. *Sunoco*, 32 F.4th at 1169. These factors also negate the existence of an experimental agreement. *Id*.

There simply is no compelling argument or evidence to raise a genuine dispute that when Jetaire offered its Invicta product for sale to Xtra Airways and AerSale, its primary purpose was experimental rather than commercial. Jetaire relies on testimony from Mr. Nezaj of AerSale that the Invicta product had a “poor design” and that it was “difficult to remove and reinstall.” [D.E. 239 at 14]. But Jetaire points to no authority to suggest that because a purchaser does not like a product, it must be that “the primary purpose of the offer[ ] … was to conduct experimentation.” *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008).

Beyond Mr. Nezaj's irrelevant testimony, the record is devoid of evidence to raise a triable issue that Jetaire offered the sale of its Invicta product primarily for experimental purposes; this is especially true where Jetaire wholly lacks the "critically important" element of control over the alleged experiments. *Lough*, 86 F.3d at 1120; *see also Cargill, Inc.*, 476 F.3d at 1370 (granting summary judgment on the basis of the on-sale bar where the offeror's "post hoc effort to say [that the offeror] did not intend what is abundantly plain from the price, quantity, and delivery terms on the face of the June 7 letter does not raise a genuine issue of fact"); *Pennwalt Corp. v. Akzona Inc.*, 740 F.2d 1573, 1581 (Fed. Cir. 1984) ("Any experimentation over one year before an application's filing date must be for a bona fide experimental purpose rather than for commercial exploitation. If any commercial exploitation does occur, it must be merely incidental to the primary purpose of experimentation to perfect the invention. Here, based on testimony by Pennwalt's employees, the district court found that Pennwalt's primary motive in seeking an EPA temporary permit was for the commercial purpose of recovering developmental expenses and testing the market. … [T]he district court correctly held as a matter of law that … the [ ] patent .. was … invalid.") (internal citations omitted).

In contrast to *EZ Dock*, 276 F.3d at 1353, Jetaire simply fails to offer any facts to show that it monitored AerSale's ostensibly-experimental use of the product, visited AerSale to gauge the viability of the Invicta product, or acted in any other manner to suggest it had "control over the alleged testing to establish experimentation." *See Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361,

18

1366 (Fed. Cir. 2008) ("Atlanta Attachment was not experimenting within the contemplation of the experimental use doctrine when it sold its invention to Sealy because Sealy performed the testing and because Atlanta Attachment did not have control over the alleged testing to establish experimentation."). In fact, at the hearing on this motion, counsel for Jetaire conceded that "only AerSale would know" when asked at what point the alleged "prototype" was removed from the aircraft. [D.E. 316 at 73:3–12]. This acknowledgment, coupled with an absence of evidence as to whether Jetaire monitored the alleged experiments, demonstrate that no reasonable juror could conclude that for purposes of the on-sale bar, Jetaire's primary motive was experimentation.

At best, any experimentation was "merely incidental" to the primary purpose of commercial exploitation. *Pennwalt Corp.*, 740 F.2d at 1581; *see also Lough*, 86 F.3d at 1120 ("The … factor of control is critically important, because, if the inventor has no control over the alleged experiments, he is not experimenting. If he does not inquire about the testing or receive reports concerning the results, similarly, he is not experimenting."); *Electromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec. Co.*, 417 F.3d 1203, 1212 (Fed. Cir. 2005) ("When sales are made in an ordinary commercial environment and the goods are placed outside the inventor's control, an inventor's secretly held subjective intent to 'experiment,' even if true, is unavailing without objective evidence to support the contention. Under such circumstances, the customer at a minimum must be made aware of the experimentation.") (quoting *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d

1066, 1072 (Fed. Cir. 1992)); *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1334 (Fed. Cir. 1998) (affirming the district court's rejection of Weatherchem's experimental use argument where "Weatherchem was not jointly experimenting with Durkee" and therefore "Weatherchem did not show experimental use of the [invention]").

Separately, Jetaire argues that it could not have made a commercial offer for sale because, at the time of its offer, it had not yet received its FAA-issued Parts Manufacturing Authorization ("PMA") or STC. Specifically, Jetaire argues that, per its expert (Mr. Ashworth), at the time of the alleged offer, the Invicta product could not have been sold because it lacked the requisite certifications.

This argument is also not persuasive. First, factually speaking, Jetaire's July 14 offer to AerSale makes abundantly clear that it "anticipate[d] that the FAA w[ould] issue the STC sometime th[at] week." [D.E. 315-28 at 3]. The lack of timely FAA approval, therefore, clearly did not dissuade Jetaire's decision to offer the Invicta product to AerSale in exchange for hundreds of thousands of dollars.

And even if it did, as the Federal Circuit has made clear, the fact that a sale cannot be consummated until the future does not undermine the fact that a commercial offer was made—i.e., all that is required under *Pfaff. See Cargill, Inc.*, 476 F.3d at 1370 ("Cargill tries to recast its offer for sale as merely a ramp up to a business relationship, pointing out that the June 7 letter suggested that DNAP wanted "very much to do business" with P & G and that the parties should discuss a purchase agreement. However, expressing a desire to do business in the future does

not negate the commercial character of the transaction then under discussion."). Section 102 imports no requirement that the delivery of the product offered for commercial sale must take place instantaneously with acceptance, nor does Jetaire point the Court to any law to the contrary. *See* 35 U.S.C. § 102.

Second, even if FAA approval could not be procured by the time of the proposed sale, the Federal Circuit has clarified that "the mere fact that the offer for sale was illegal or ineffective does not remove it from the purview of" the on-sale bar. *Evans Cooling Sys., Inc. v. Gen. Motors Corp.*, 125 F.3d 1448, 1452 (Fed. Cir. 1997) ("Evans argues that Mr. Najarian's order is ineffective … because GM had not yet received fuel economy labels or a Certificate of Conformity from the EPA. Even assuming this to be the case, the mere fact that the offer for sale was illegal or ineffective does not remove it from the purview of the section 102(b) bar."). Accordingly, Jetaire's argument that the Invicta product had not received FAA approval at the time of its offer is, for several reasons, of no moment.

In sum, drawing all reasonable inferences in favor of Jetaire and as a matter of law, on December 9, 2013, Jetaire made a commercial offer for sale of the Asserted Patents to Xtra Airways; on April 11, 2014, Jetaire made a revised commercial offer for sale of the Asserted Patents to Xtra Airways; and on July 14, 2014, Jetaire made a revised commercial offer for sale of the Asserted Patents to AerSale.[4]

---

[4] The record evidence fails to demonstrate that on August 21, 2014, an offer for sale was made. That email simply lacks the requisite elements of a commercial for sale under *Pfaff*; i.e., price terms, quantity terms, delivery terms, intent to transfer title, the placing of the power of acceptance into AerSale's hands, and other persuasive indicia.

## 2. *Ready for Patenting*

Next, we assess the second requirement of *Pfaff's* on-sale bar test: that "the invention must be ready for patenting." 525 U.S. at 67. The Federal Circuit in *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.* aptly described the meaning of "ready for patenting":

> An invention is "ready for patenting" when evidence shows that the invention was reduced to practice or described in a written description sufficient to permit one of ordinary skill in the art to practice the invention without undue experimentation. An invention is reduced to practice when the patentee has an embodiment that meets every limitation and operates for its intended purpose. An invention works for its intended purpose when there is a demonstration of the workability or utility of the claimed invention.

488 F.3d 982, 997 (Fed. Cir. 2007) (internal citations omitted). That being said, "'fine-tuning' of an invention after the critical date does not mean that the invention was not ready for patenting." *Hamilton Beach Brands, Inc. v. Sunbeam Prod., Inc.*, 726 F.3d 1370, 1379 (Fed. Cir. 2013) (citing *Weatherchem*, 163 F.3d at 1332–34). But "[t]o be 'ready for patenting' the inventor must be able to prepare a patent application, that is, to provide an enabling disclosure as required by 35 U.S.C. § 112." *Space Sys./Loral, Inc. v. Lockheed Martin Corp.*, 271 F.3d 1076, 1080 (Fed. Cir. 2001).

AerSale does not argue that the Invicta product became ready for patenting when it was "reduced to practice." *Honeywell Int'l Inc.*, 488 F.3d at 997. Rather, AerSale argues that the Asserted Patents became ready for patenting on May 23, 2013, at which time Jetaire applied for an STC for its Invicta product. AerSale further argues that, at the latest, the item was ready for patenting on July 28, 2014, when Jetaire received an STC from the FAA. Jetaire, meanwhile, argues that the Asserted

Patents could not have been ready for patenting at the times argued by AerSale because the product was defective until 2016. This is evidenced, Jetaire argues, by the fact that AerSale itself deemed Jetaire's product faulty, per Mr. Nezaj's testimony. *See* [D.E. 239 at 14] (Mr. Nezaj testifying that Jetaire's product had a "poor design" and was "difficult to remove and install").

We find, drawing all reasonable inferences in favor of Jetaire, that on July 14, 2014, a reasonable juror could conclude only that the Invicta product was ready for patenting under *Pfaff*. Undisputedly, at the time Jetaire made its July 14 offer to AerSale, Jetaire applied to the FAA to obtain an STC for the Invicta product. Further, its indisputable that Jetaire anticipated the immediate issuing of that STC. [D.E. 315-28 at 3] ("We [Jetaire] anticipate that the FAA will issue the STC sometime this week of July 14, 2014, and will notify you as soon as it is received."). Jetaire is hard pressed to argue, then, that its Invicta products were not ready for patenting at the time of its July 14 offer—especially because it does not present to the Court a meaningful difference between the requirements for an STC and the requirements for patentability. This is further bolstered by the fact that only a month later, Jetaire was "taking orders for the [Invicta] system now!" [D.E. 315-23 at 2].

Moreover, counsel for Jetaire acknowledged in the hearing on this motion that while "[w]e do disagree with [AerSale's] characterizations that it was ready for patenting at the time the STC application was filed …, really this case is going to hinge on whether or not there was a commercial offer for sale." [D.E. 316 at 52:6–9].

While this quasi-concession is not dispositive, it is coupled with record evidence that substantiates Jetaire's counsel's lack of fervor on this issue.

Specifically, in paragraph 17 of its statement of facts, AerSale cites to numerous attachments to Jetaire's STC application, which detail drawings of the Invicta product and detail the installation process. [D.E. 315-18; D.E. 315-20; D.E. 315-21; D.E. 315-22; D.E. 315-24; D.E. 315-25]. One document, for example, "shows installation sequence and position number of already trimmed piece of foam … so that installation time is minimized as follows." [D.E. 315-25]. Another document "governs installation of Jetaire Invicta brand Ignition Mitigation Means (I2MT) in the Center Wing Tank (CWT) of any B737 … Series Aircraft to bring it into compliance with SFAR 88 requirements." [D.E. 315-21]. That document includes a list of detailed "foam fabrication drawings" and "foam installation drawings." [D.E. 315-21].

Jetaire's response in opposition to AerSale's motion does not address head-on these attachments, or whether they accurately reflect the patented product. While Jetaire mentions in its statements of fact that "iterative design and configuration changes" occurred after the STC application [D.E. 239 at ¶ 17], Mr. Williams' actual testimony undermines Jetaire's argument. Specifically, he testified that "[t]here may have been some changes to the … foam shapes," and that its "not uncommon for us to find better ways of manufacturing or installing." [D.E. 315-1 at 57:15–22; 58:3–9]. This testimony does nothing to persuade the Court, nor a reasonable factfinder, that

the supposed "changes" that "may have been made" transformed the Invicta product from unpatentable on July 14, 2014 to patentable thereafter.

As an initial matter, Mr. Williams testimony does not explain whether the changes that "may" have occurred were effectuated before or after July 14, 2014. Additionally, Mr. Williams hardly elaborates on the supposed changes, and Jetaire fails to present evidence to show that the supposed changes were made after July 14, 2014. Jetaire also fails to demonstrate these supposed changers were appreciable in terms of the patent process, let alone that they turned a non-patentable product into a patentable product. Accordingly, a reasonable factfinder is left with no choice but to infer that, if changes even took place, they were precisely the "fine-tuning of an invention" that the Federal Circuit has held not to impact the *Pfaff* analysis. *See Hamilton Beach Brands, Inc.*, 726 F.3d at 1379 (citing *Weatherchem,* 163 F.3d at 1332–34) (noting that "'fine-tuning' of an invention after the critical date does not mean that the invention was not ready for patenting."); *see also Cont'l Plastic Containers v. Owens Brockway Plastic Prod., Inc.*, 141 F.3d 1073, 1078 (Fed. Cir. 1998) (affirming a finding that an item was a ready for patenting despite seven revisions "to accommodate the manufacturing difficulties," because "there were insufficient differences to rise to the level of a practical ornamental difference from the pre-critical date drawings and, hence, the molds and article drawings did embody the patented design.").

Moreover, in its response, Jetaire relies almost entirely on AerSale's dislike for the Invicta product to show that it was not ready for patenting; specifically, that Mr.

Nezaj thought it was "trash" and uninstalled it. But whether AerSale or Xtra Airways disliked the Invicta product is not dispositive of whether the product was ready for patenting. The Federal Circuit is cognizant of the fact that a product's concept before reduction to practice need not be impeccable in the eyes of the conceiver: "It will be a rare case indeed in which an inventor has no uncertainty concerning the workability of his invention before he has reduced it to practice." *Robotic Vision Sys., Inc.*, 249 F.3d at 1312.

Jetaire's argument is especially unpersuasive when weighed against Jetaire's quasi-concession in the hearing, Jetaire's limited response in opposition to the "ready for patenting" prong, and Jetaire's failure to show that the patented version of its Invicta product is materially different than the version of its Invicta product for which it obtained FAA approval. *See Robotic Vision Sys., Inc.*, 249 F.3d at 1312 (finding that a detailed concept that had not yet actually been created satisfied *Pfaff*, because "[n]otably absent from this test is a requirement that an inventor have complete confidence that his invention work will work for its intended purpose. Such confidence often must await a reduction to practice, which is a separate basis on which an invention may be shown to be ready for patenting.").

Based on this record, the Court is persuaded that at least on July 14, 2014, if not earlier, Jetaire in its STC application "described [its Invicta product incorporating the Asserted Patents] in a written description sufficient to permit one of ordinary skill in the art to practice the invention without undue experimentation." *Honeywell Int'l Inc.*, 488 F.3d at 997. Accordingly, because no reasonable juror could make a

contrary finding (i.e., no reasonable juror could find, based on the STC application and Mr. Williams' testimony, that the Invicta product was *not* ready for patenting at least one year before the effective filing date of the Asserted Patents), we find that the Invicta product was "ready for patenting" under *Pfaff*.

Therefore, because both prongs of *Pfaff's* on-sale bar test have been satisfied, we recommend that summary judgment be granted in favor of AerSale as to its on-sale bar argument. And, because the consequence of the on-sale bar is invalidation of the subject patents, we further recommend that the Asserted Patents be invalidated on this basis. *See Robotic Vision Sys., Inc.*, 249 F.3d at 1313 (affirming finding that a patent was invalid because the on-sale bar's requirements were satisfied); *Helsinn Healthcare S.A.*, 855 F.3d at 1375 (same); *Vanmoor*, 201 F.3d at 1367 (same).

### B.    *Other Bases for Invalidity Are Moot*

As a result, the Court need not reach the remainder of AerSale's arguments, all of which seek invalidation of the Asserted Patents, seek a declaration that AerSale did not infringe upon the Asserted Patents, or argue that Jetaire suffered no lost profit damages from the alleged infringement. These issues are effectively moot.

### IV.    CONCLUSION

For the reasons set forth above, we recommend that AerSale's motion for summary judgment [D.E. 196] in favor of its counterclaims I, II, III, IV, V, and VI [D.E. 159] be **GRANTED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to

file written objections, if any, to the District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 17th day of April, 2024.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

28